SIXTH DIVISION
June 18, 2010

No. 08-1116

| | | |
|---|---|---|
| I.C.S. ILLINOIS, INC. and A&T TRUCKING COMPANY, on Behalf of a Class of Others Similarly Situated, | ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. County Department, Chancery Division |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| WASTE MANAGEMENT OF ILLINOIS, INC., REMEDIAL ENVIRONMENTAL MANPOWER, INC., and WINDY CITY LABOR SERVICE, INC., | ) ) ) ) ) | No. 05 L 9330 Honorable Peter Flynn, Judge Presiding |
| Defendants-Appellees. | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This appeal arises from a suit brought by plaintiffs ICS Illinois, Incorporated (ICS) and A&T Trucking (A&T) against defendants Waste Management of Illinois, Incorporated (Waste Management), Remedial Environmental Manpower, Incorporated (REM), Windy City Labor Service (Windy City), and Curtis Trucking, Incorporated (Curtis). Plaintiffs are certified minority business enterprises (MBEs) and sought leave of court to file a fifth amended complaint alleging that defendant Waste Management contracted with the City of Chicago as a primary contractor to construct and maintain recycling facilities and was obligated by contract and municipal ordinance to hire MBE entities as subcontractors or purchase goods and services from MBE entities in performing that primary contract. Plaintiffs allege that the other defendants REM, Windy City, and Curtis were fraudulently certified as MBEs and awarded subcontracts by Waste Management in an effort to make it appear that Waste Management was complying with

the MBE requirements. The circuit court denied plaintiffs' motion for leave to file the complaint, holding that plaintiffs could not plead adequate facts to support their claim of standing to sue defendants and that their complaint substantively failed to state a cause of action. Plaintiffs now appeal. For the reasons articulated below, we affirm.

## I. BACKGROUND

On August 25, 2005, plaintiff ICS Illinois filed its original complaint in this case in the law division of the circuit court of Cook County and soon thereafter filed an amended complaint after receiving leave of court to do so. On June 8, 2006, the matter was transferred to the chancery division and assigned to the Honorable Peter Flynn, who subsequently granted plaintiffs leave to file a second amended complaint.

ICS and a new plaintiff, T&B Cartage (T&B), Incorporated, on behalf of themselves and other similarly situated MBEs, filed a second amended complaint on August 15, 2006. That complaint alleged that defendants REM and Windy City were fraudulently certified as MBEs, were both operated and controlled by a Caucasian male named James Duff, and received subcontracts on Waste Management's contracts with the city as MBEs. ICS alleged that this fraudulent arrangement diverted city funds intended to go to legitimate MBEs and to the subcontracting defendants instead, depriving MBEs of the opportunity to receive the economic benefits under the contracts with the city. ICS and T&B brought claims for consumer fraud, civil conspiracy, and tortious interference with prospective economic advantage.

Defendants subsequently filed motions to dismiss the second amended complaint under

sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2006)) arguing that plaintiffs failed to state a claim and lacked standing to bring the suit against them. A hearing was held on the matter on January 11, 2007. After Judge Flynn noted that the complaint would have to be repleaded because of various problems with its form, including its excessive length and lack of clarity, the court concluded that the second amended complaint failed to show that ICS or T&B had standing to sue defendants. The court then stated that plaintiffs would have to allege three facts before they could have standing to sue the defendants, namely, that they were in existence and certified as MBEs at the time Waste Management awarded the subcontracts to the Duff companies, that they were capable of doing the work required by the subcontracts, and that they bid for the subcontracts. The court then opined that the plaintiffs could show standing even if they did not bid for the Waste Management subcontracts if they alleged that they did not bid because they knew the bidding process was rigged against them, rendering their participation in the process futile. The court then concluded that the plaintiffs ICS and T&B Carthage did not meet this test for standing because neither was alleged to be in existence when the City of Chicago let the primary contract to Waste Management. The court granted plaintiffs' counsel leave to identify additional plaintiffs who could meet the standing requirements it set forth.

After plaintiffs failed to file a third amended complaint within the deadline set by the court, plaintiffs filed a motion for leave to file a third amended complaint. T&B Cartage, a plaintiff in the second amended complaint, was not listed as a plaintiff in the third amended complaint, but the pleading did add another MBE, A&T Trucking Company, as a plaintiff. The court denied the motion to file the third amended complaint, noting that the third amended

complaint was 166 pages long, single-spaced and was too long to constitute a viable complaint, but granted plaintiffs leave to file a fourth amended complaint "after it has gone on a substantial diet."

Plaintiffs ICS and A&T Trucking filed a motion to file a fourth amended complaint. On November 7, 2007, the court denied that motion but granted plaintiffs leave to file a motion for leave to file a fifth amended complaint.

On November 26, 2007, plaintiffs ICS and A&T Trucking filed a motion for leave to file a 10-count, fifth amended complaint (hereinafter the complaint). The first nine counts were brought by plaintiff A&T and the last count was brought by ICS. The complaint substantially repeated the allegations of the previous five complaints and added another defendant, Curtis Trucking, Incorporated. Plaintiffs ICS and A&T specifically alleged that Waste Management entered into a contract with the City of Chicago in 1993 to design, construct and operate "Blue Bag" recycling facilities. They contended that the contract incorporated the minority business enterprise/women business enterprise (MBE/WBE) hiring requirements articulated in section 2-92-440(a) of the Municipal Code (Chicago Municipal Code §2-92-440(a)(2008)), which obligated Waste Management to expend 25% of the total dollar value of the contract hiring or doing business with MBEs and to expend 5% of the total value hiring or doing business with WBEs. Plaintiffs alleged that the contract with the city included provisions requiring the use of "unskilled labor services for janitorial, cleanup and sorting" as well as "trucking, hauling and labor related services" that could be subcontracted to MBE/WBE entities.

Plaintiffs' complaint alleged that they are certified MBE/WBE entities and could have

been utilized as subcontractors by Waste Management to help satisfy the MBE/WBE requirements of its contract with the city. The complaint further alleges that plaintiff ICS was incorporated in 1996, is in the same business as defendants REM and Windy City, namely, "supplying unskilled labor for janitorial, cleanup and/or sorting services," and was "legitimately certified by the City of Chicago as an MBE/WBE/DBE from at least 1997 to 2000." The complaint also averred that A&T was incorporated in 1984, was in the same business as defendant Curtis, namely "trucking, hauling and some labor related services," and certified with the City of Chicago as an MBE at all relevant times. Plaintiffs asserted that they were not given the opportunity to bid on subcontracts with Waste Management because the primary contractor awarded the subcontracts to defendants REM, Windy City, and Curtis Trucking "[a]t all times relevant during 1995 and 2002."

Plaintiffs further alleged that Waste Management awarded these subcontracts to REM, Windy City, and Curtis Trucking in order to convey the impression that it was complying with the MBE/WBE expenditure requirements incorporated into its contract with the city, even though the companies were owned and operated by a Caucasian male named James Duff. According to plaintiffs, an employee at Waste Management named James Barry conspired with Duff to circumvent the MBE/WBE requirements of Waste Management's primary contract with the city by hiring Duff's companies, REM, Windy City, and Curtis Trucking, as "MBE/WBE entities." The complaint avers that, pursuant to this scheme, defendants were fraudulently and falsely certified as "MBE/WBE entities."[1] As a result of this fraudulent scheme, plaintiff A&T alleges

---

[1]Although plaintiffs state in their complaint that defendant REM was fraudulently

that it was "deprived of the opportunity to participate in fraud free business dealings with the City of Chicago, the opportunity to grow and expand as a legitimate MBE/WBE entity as intended by the MBE/WBE program, and the opportunity to earn sums from the City of Chicago MRRF contract."

Consequently, A&T brought nine causes of action against defendants seeking monetary damages in excess of $50,000 for each. In count I, A&T alleged that Waste Management committed common law fraud in perpetrating the above scheme. It specifically claimed that Waste Management promised the city that it would comply with the MBE/WBE requirements of section 2-92-440 (a) of the Municipal Code, that the company received the contract from the city based upon this representation, and that Waste Management had no intention to comply with the requirements. A&T further contended that Waste Management assisted with the fraudulent certification of the Duff companies as MBE/WBE entities and periodically submitted fraudulent records to the city indicating that it was complying with the MBE/WBE requirements. A&T further asserted that Waste Management knew that its fraudulent activity would induce legitimate MBE/WBE entities to desist from offering competitive bids for subcontracts or challenging the award of the subcontracts to REM, Windy City, and Curtis on the belief that the subcontracts were let out in compliance with the MBE/WBE requirements. A&T averred:

"[A]t all relevant times, it would have bid and otherwise sought to secure a

_____

certified as an MBE, they allege only that Windy City and Curtis Trucking were certified as "MBE/WBE entities," without specifically stating whether each company was certified as a MBE, a WBE, or both.

6

contract on the MRRF, but for the existence of Waste Management's sham arrangements, pre-arranged deals, and rampant fraud, including, rampant fraudulent actions to obtain MBE/WBE Certifications for non-minority and non-woman owned entities including the Duff Companies, which A&T knew of and which made it impossible for A&T as a legitimate MBE/WBE certified entity to get a fair opportunity at securing the contract."

In count II, labeled "Consumer Fraud Act 815 ILCS 505/1 A&T Trucking, Inc. v. Waste Management of Illinois, Inc.," A&T simply incorporated the pleadings of count I and made no further accusations.

In count III, A&T brought a claim against Waste Management for intentional interference with prospective economic advantage. In doing so, A&T incorporated the pleadings of count I by reference and further alleged that Waste Management "knew that Plaintiffs had a reasonable expectancy of entering into a legitimate business relationship as MBE/WBE [entities] with the City of Chicago director or as a subcontractor" and "intentionally interfered with the Plaintiff's [sic] ability to realize their expectancy and as a consequence, Plaintiffs lost opportunities to engage in business with the City of Chicago, and grow their respective businesses."

In count IV, labeled "Civil Conspiracy A&T Trucking, Inc. v. Waste Management of Illinois, Inc.," A&T incorporated the pleadings of count I and made no further accusations.

In count V, A&T brought an action against defendants Waste Management, REM, Windy City, and Curtis alleging that the actions of those defendants violated the civil Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § § 1962(a) through (d) (2006)). The count

incorporated the allegations of count I by reference and further alleged that defendants engaged in an common enterprise to "defraud the MBE/WBE procurement program."

In count VI, A&T alleged that REM, Windy City, and Curtis committed common law fraud. A&T incorporated the allegations of count I by reference and further claimed that defendants fraudulently gained certification as MBE/WBE entities despite the fact that they were owned and operated by a Caucasian male, Duff, and committed various acts thereafter to cover up this truth. A&T contended that these actions "would induce reliance by the City of Chicago and its citizens, potential competitors and subcontractors, including, but not limited to A&T, causing them to take no action, submit no bid, and make no challenge to the award of business to the fraudulent the Duff Companies." A&T further alleged that it did not bid on the instant contract or seek to secure a subcontract because it knew that, despite its qualifications, it would be a "waste of time" to pursue such contracts given the fact that it was effectively excluded from gaining work from Waste Management under the contract with the city due to the actions of defendants.

In count VII, labeled "Consumer Fraud Act 815 ILCS 505/1 A&T Trucking, Inc. v. Curtis, REM and Windy City Maintenance, Inc.," A&T incorporated the pleadings of count I and made no further accusations.

In count VIII, A&T brought a claim against REM, Windy City, and Curtis for intentional interference with prospective economic advantage. In doing so, A&T incorporated its allegations in count VI by reference and further alleged that as a result of those defendants' fraudulent actions, it was "deprived of the opportunity to grow and expand his legitimate MBE/WBE entity

No. 1-08-1116

as intended by the MBE/WBE program, and the opportunity to earn sums from the City of Chicago MRRF contract."

In count IX, labeled "Civil Conspiracy A&T Trucking, Inc. v. Curtis, REM and Windy City Maintenance, Inc.," A&T incorporated the pleadings of count VIII, but made no further allegations.

Count X was the only count brought by plaintiff ICS. In that count, ICS sued Waste Management, REM, Windy City, and Curtis for common law fraud, incorporating the allegations of count I by reference and further alleging that defendants fraudulently certified REM, Windy City, and Curtis as MBE/WBE entities and thereafter concealed the fact. It also asserted that it knew that:

> "[I]llegitimate MBE/WBE subcontractors like REM, Curtis & Windy, who were
> not minority or woman owned businesses were fraudulently obtaining MBE/WBE
> certifications and that bidding on projects such as the RFP described above or
> seeking to be subcontractors was a complete waste of time because of the fraud
> and deceptive practices that were in place to steer such business to corporations
> that did not truly meet the specifications of the MBE/WBE program."

ICS prayed for $50,000 in damages.

The complaint was brought as a class action lawsuit and A&T and ICS were presented as potential class representatives. It stated that A&T was bringing the action on behalf of "all legitimately certified MBE/WBE entities providing trucking, hauling, and some labor services between 1990 and 2002" and that ICS was bring the action on behalf of "any and all legitimately

9

certified MBE/WBE entities providing unskilled labor for janitorial, construction and industrial clean-up services between 1997 and 2000." No exhibits were attached to the complaint.

A hearing was held on plaintiffs' motion for leave to file a fifth amended complaint on March 11, 2008, and after considering the arguments of the parties, the court denied plaintiffs' motion. Although the court noted that the proposed fifth amended complaint had been filed in a timely manner and that its contents would not surprise the defendants, it held that the complaint failed to support a finding that the plaintiffs had standing to bring the action and that theses failings would not be remedied by allowing subsequent pleadings. In doing so, the court reiterated its opinion that in order to have standing to challenge the improper award of a subcontract on a government contract, a subcontractor must allege that it bid on the contract or failed to do so because it believed such a bid to be an exercise in futility given fraud on the part of the general contractor. The court then noted that the plaintiffs in this case did not allege that they had bid for subcontracts under Waste Management's general contract with the city. The court further concluded that plaintiffs failed to adequately allege that they did not bid for such subcontracts because they believed that such an act would have been futile given Waste Management's scheme to fraudulently give the MBE work to the Duff companies. It did so noting that plaintiffs' complaint "does not specifically link any Plaintiff to any conduct by the specific Defendants. The complaint is much more general than that." The court continued by explaining that the complaint merely alleged that plaintiffs did not bid because they were aware of systematic abuses of the MBE/WBE program generally by general contractors that fraudulently awarded MBE/WBE-designated subcontracts to non-minority- and non-female

10

owned businesses and did not allege that they failed to bid because of any specific knowledge of the actions of the particular defendants in that case, namely, Waste Management and the Duff companies.

The plaintiffs then made an oral motion to conduct additional discovery to assist in preparing their pleading, but the court denied the motion on grounds that plaintiffs had already taken some discovery previously and that, in light of a previous criminal prosecution of Duff, the conduct of the defendants was "not nearly as murky as it usually is in a case of this sort." The court also noted: "the key flaws in this case do not lie in my view in information which is solely within the knowledge of the Defendants. They lie in the Plaintiffs [*sic*] inability to link themselves to particular contracts." Plaintiffs now appeal.

ANALYSIS

On appeal, plaintiffs argue that the circuit court erred in denying their motion for leave to file a fifth amended complaint, contending that they adequately established standing to bring the instant lawsuit against defendants.

Before proceeding to the merits of plaintiffs' claims, however, we note that the parties disagree as to the standard of review applicable in this case. Although plaintiffs initially note in their brief that the "standard of review for the denial of leave to file an amended complaint is whether the trial court abuses its discretion," they nevertheless argue that the standard applicable in this case is <u>de novo</u> because the circuit court's denial of their motion to file a fifth amended complaint was based upon its review of their complaint and legal conclusion that plaintiffs could

11

No. 1-08-1116

not plead adequate facts to establish standing or that defendants' conduct was the proximate cause of their alleged injuries. We disagree with the latter contention.

The decision to grant leave to amend a complaint rests within the sound discretion of the circuit court and we will not reverse such a decision absent an abuse of that discretion. Keefe-Shea Joint Venture v. City of Evanston, 364 Ill. App. 3d 48, 61 (2005); Hayes Mechanical, Inc. v. First Industrial, L.P., 351 Ill. App. 3d 1, 7 (2004); Ruklick v. Julius Schmid, Inc., 169 Ill. App. 3d 1098, 1111 (1988); Schenker v. Chicago Title & Trust Co., 128 Ill. App. 3d 488, 491 (1984). Under section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616(a) (West 2006)), the circuit court may grant plaintiff leave to amend its complaint on just and reasonable terms at any time prior to final judgment. This right to amend, however, is neither absolute nor unlimited. Hayes Mechanical, Inc., 351 Ill. App. 3d at 6. In determining whether the circuit court abused its discretion in granting or denying such leave, this court must consider "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." Loyola Academy v. S&S Roof Maintenance, Inc., 146 Ill. 2d 263, 273 (1992). The plaintiff must meet all four factors, and "if the proposed amendment does not state a cognizable claim, and thus, fails the first factor, courts of review will often not proceed with further analysis." Hayes Mechanical, Inc., 351 Ill. App. 3d at 7. Accordingly, "[w]here it is apparent even after amendment that no cause of action can be stated, leave to amend should be denied." Hayes Mechanical, Inc., 351 Ill. App. 3d at 7. "[W]hen ruling on a motion to amend, the court may consider the ultimate efficacy

12

of a claim as stated in a proposed amended pleading" and it is not necessary for the plaintiff to file an amended complaint and the defendant to test the sufficiency of that complaint through a motion to dismiss. Hayes Mechanical, Inc., 351 Ill. App. 3d at 7.

In reaching this conclusion, we reject as inapposite those cases cited by plaintiffs for the proposition that the de novo standard of review is applicable in this case, as all of those cases concerned the standard of review applicable to an appeal from the dismissal of a complaint, not from a court's denial of leave to file a complaint. City of Chicago v. Beretta U.S.A. Corp., 213 Ill. 2d 351 (2004); La Salle National Bank v. City Suites, Inc., 325 Ill. App. 3d 780 (2001); Dimensions Medical Center, Ltd. v. Advanced Ambulatory Surgical Center, Inc., 305 Ill. App. 3d 530 (1999); Metzger v. New Century Oil & Gas Supply Corp. Income & Development Program, 230 Ill. App. 3d 679 (1992).

Thus, in determining whether the circuit court erred in denying plaintiffs leave to file a fifth amended complaint, we must first determine whether the plaintiffs have standing to bring this action. Plaintiffs assert that they were injured by defendants' actions in two ways, namely, that their fraudulent scheme caused them (1) to lose the opportunity to compete for the subcontracts issued by Waste Management and (2) to lose profits that would have inured to them had they been able to obtain any of those subcontracts.

The rules of standing in Illinois were comprehensively analyzed by our supreme court in Greer v. Illinois Housing Development Authority, 122 Ill. 2d 462 (1988). In that case, the court rejected the so-called "zone of interests" test which is applied in federal courts to grant standing only to those plaintiffs who suffer an injury in fact and seek to protect an interest that is

No. 1-08-1116

" 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " Greer, 122 Ill. 2d at 489, quoting Ass'n of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 25 L. Ed. 2d 184, 188, 90 S. Ct. 827, 830 (1970). Instead, our supreme court required only that plaintiff demonstrate an "injury in fact to a legally cognizable interest." Greer, 122 Ill. 2d at 492. A "legally cognizable interest," the court explained, exists when that injury, whether actual or threatened, is (1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief. Greer v. Illinois Housing Development Authority, 122 Ill. 2d 462, 492-93 (1988).

To determine standing in a class action, our focus must be on the named plaintiffs themselves and not on the general class they purport to represent. As the United States Supreme Court has noted:

"Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief on behalf of himself or any other member of the class.' " Warth v. Seldin, 422 U.S. 490, 502, 45 L. Ed. 2d 343, 357, 95 S. Ct. 2197, 2207 (1975), quoting O'Shea v. Littleton, 414 U.S. 488, 494, 38 L. Ed. 2d 674, 682, 94 S. Ct. 669, 675 (1974).

The issue presented in this case is whether the plaintiff MBEs have standing to sue

14

defendants for damages arising from their alleged fraudulent scheme to subvert the City's MBE/WBE program by arranging for the nonminority, male-owned Duff companies to receive MBE/WBE-designated subcontracts from Waste Management. More precisely, we must determine whether plaintiffs have standing to sue even though they have not alleged that but for defendants' misconduct they would have procured the subcontracts at issue for themselves. In fact, the plaintiffs have alleged that none of the subcontract work was made subject to any competitive bidding. Thus, the central issue with respect to standing which must be addressed is whether plaintiff would be required to plead and ultimately prove (1) that they affirmatively undertook to compete for the procurement of the business and (2) that they would have won that competition but for defendants' misconduct. There appears to be a lack of complete clarity in the case law on this issue.

In support of the proposition that plaintiffs were required to plead that they would have acquired subcontracts from Waste Management but for defendants' fraud, defendants cite Amtech Systems Corp. v. Illinois State Toll Highway Authority, 264 Ill. App. 3d 1095 (1994), Daley's Dump Truck Service, Inc. v. Kiewit Pacific Co., 759 F. Supp. 1498 (W.D. Wash. 1991); and AT/Comm, Inc. v. Illinois State Toll Highway Authority, No. 96 C 6961 (N.D. Ill. April 24, 1997). The first of these cases, Amtech Systems Corp., is the only precedential Illinois case cited by either of the parties. In that case, the plaintiff, a manufacturer of equipment used for electronic toll collection systems, sued the Illinois State Toll Highway Authority for drafting a "request for proposals" (RFP) soliciting bids for a primary contract to construct a toll collection system in such a manner that only the equipment of plaintiff's competitor could be used to fulfill

the technical requirements of the contract. Amtech Systems Corp., 264 Ill. App. 3d at 1097. Plaintiff contended that "it was deprived of a fair opportunity to participate in the bidding process for a public contract" and claimed that it was injured by the Authority's "violation of [s]tate rules governing public contracts which require open and competitive bidding" and its drafting of the RFP so that it was "totally biased in favor of one equipment manufacturer." Amtech Systems Corp., 264 Ill. App. 3d at 1103. The plaintiff alleged in its complaint that it did not submit a bid for the prime contract with the Authority, but actively campaigned to be listed as a subcontractor on the primary bids submitted by others. Amtech Systems Corp., 264 Ill. App. 3d at 1099.

On appeal, the court concluded that the plaintiff lacked standing to bring suit against the Authority because it made no factual allegation that it suffered a distinct injury fairly traceable to the Authority's conduct. Amtech Systems Corp., 264 Ill. App. 3d at 1105. In doing so, the court observed that plaintiff did not allege that it bid on the Authority's contract or was restrained or precluded from doing so, did not claim that the general contractor it was working with submitted the lowest bid for the general contract, did not claim that the bid went to a nonresponsive or ineligible bidder, and failed to present "any persuasive authority supporting its position that an entity, such as itself, which has not bid has standing to file suit after the contract has been awarded." Amtech Systems Corp., 264 Ill. App. 3d at 1105. Therefore, the court held, there was no factually supported allegation of a distinct injury to Amtech or a " 'personal claim, status, or right' " that would be " 'substantially likely to be prevented or redressed by the grant of the requested relief.' " Amtech Systems Corp., 264 Ill. App. 3d at 1105, quoting Greer v. Illinois Housing Development Authority, 122 Ill. 2d 462, 492-93 (1988).

16

Thus, in Amtech, the court concluded that a subcontractor who did not bid for a public contract and could not show that the general contractor who named it as a subcontractor in its bid was the lowest bidder on the general contract did not suffer distinct and palpable injury which was fairly traceable to the Authority's alleged conduct and remediable by the relief sought. Amtech Systems Corp., 264 Ill. App. 3d at 1105. The subcontractor in that circumstance could gain nothing by bringing a successful claim challenging the bidding procedure because it could not show that it would have received a benefit had the bidding procedure been conducted properly. Amtech Systems Corp., 264 Ill. App. 3d at 1105.

Turning outside this state, defendants find support from a decision of the federal court for the Western District of Washington in Daley's Dump Truck Service, Inc. v. Kiewit Pacific Co., 759 F. Supp. 1498 (W.D. Wash. 1991). In that case, as here, plaintiff MBEs alleged that a general construction contractor utilized a fraudulent scheme to employ nonminority businesses to perform MBE-allocated contracts. Daley's Dump Truck Service, Inc., 759 F. Supp. at 1499-1500. Plaintiffs sought to represent a class of MBEs that could have been utilized to complete the contract work and alleged that they were injured by defendants' scheme because it "reduced the opportunity for plaintiffs to participate in public works contracts." Daley's Dump Truck Service, Inc., 759 F. Supp. at 1500. The district court found that plaintiffs did not have standing to bring such a claim. Daley's Dump Truck Service, Inc., 759 F. Supp. at 1500-01.

In doing so, the court held that a subcontractor does not show injury and causation for purposes of establishing standing to challenge the award of a general contract unless it can show that it would have won the subcontract had the proper bidding procedures been followed.

17

Daley's Dump Truck Service, Inc., 759 F. Supp. at 1501. The court also rejected the proposition that a subcontract could gain standing by alleging that it belonged to a class of subcontractors from which the winning subcontractor would have been selected, observing that only the claims of the named plaintiffs in a class action may be considered in determining standing to bring a class action because " '[i]f the plaintiff has no standing individually, then no case or controversy arises, and the plaintiffs' claims are not typical of the claims of those who might otherwise litigate the action.' " Daley's Dump Truck Service, Inc., 759 F. Supp. at 1501, quoting 1 H. Newberg, Newberg on Class Actions §2.07, at 58 (2d ed. 1985). The court also cited the United States Supreme Court's holding in Warth that a class representative must allege a controversy between themselves personally and the defendants and that it is insufficient to allege that an " 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " Daley's Dump Truck Service, Inc., 759 F.Supp. at 1501, quoting Warth, 422 U.S. at 502, 45 L.Ed.2d at 357, 95 S.Ct. at 2207 (1975).

Finally, defendants rely on the decision of the United States District Court for the Northern District of Illinois in AT/Comm, Inc. v. Illinois State Toll Highway Authority, No. 96 C 6961 (N.D. Ill. April 24, 1997) (mem. op.). In that case, the plaintiff was listed as a subcontractor on an unsuccessful bid to develop an electronic toll payment system of the Illinois State Toll Highway Authority. The subcontractor alleged that the Authority abused its discretion by failing to award the contract to "the lowest responsible bidder," namely the general contractor with whom it had partnered in the bidding, as required by law. Applying Illinois law, the court concluded that the subcontractor had no standing to sue the Authority because it did not place a

18

bid with the authority, but merely made an offer of goods and services to the unsuccessful general contractor and therefore did not place itself "in the special relationship by which the government could hold them to the bid." AT/Comm, No. 96 C 6961, citing Amtech Systems Corp., 264 Ill. App. 3d at 1105. In reaching this conclusion, the court rejected the subcontractor's contention that Amtech was distinguishable, in part, because the subcontractor in that case did not similarly allege that it was the lowest responsible bidder and thus would have received the subcontract but for the Authority's failure to select the lowest responsible bidder. Citing the Illinois Appellate Court's decision in Cardinal Glass Co. v. Board of Education of Mendota Community Consolidated School District No. 289, 113 Ill. App. 3d 442, 444 (1983), the court noted that the standard for determining standing in bidding cases is premised, in part, on the balance between the taxpayers' interest in having disappointed bidders sue to ensure that public contracts go only to the lowest responsible bidders and the interest of the state in not having public projects encumbered by the delays and financial costs engendered by such bidding disputes. The court noted that although Illinois courts have allowed disappointed bidders that have submitted a bid to the state to sue to ensure bidding procedures are followed, they have balanced these competing interests and have not granted standing to other classes of potential plaintiffs, including subcontractors. AT/Comm, No. 96 C 6961; see also Cardinal Glass Co., 113 Ill. App. 3d at 444 (cited by AT/Comm, which held that a contractor had standing to sue a school district for failing to award contract to lowest responsible bidder as required by the specific language of the operative statute controlling those bids when it established that it was the lowest responsible bidder and therefore would have won the contract had the school district complied

No. 1-08-1116

with the statute).

In sum, the Illinois case Amtech and the federal court decision in Daley's Dump Truck, stand for the proposition that a subcontractor suffers a legally cognizable injury sufficient to support standing when it shows that it bid for the contract and would have won the contract but for the alleged violation of the bidding procedures. Amtech Systems Corp., 264 Ill. App. 3d at 1105; Daley's Dump Truck Service, Inc., 759 F. Supp. at 1501. The AT/Comm court, which applied Illinois law, has gone a step further by denying a subcontractor standing to challenge the award of a government contract to a general contractor even though it alleged that the general contractor with whom it partnered was the lowest responsible bidder and thus that it would have received the subcontract but for the bidding procedure violation. AT/Comm, No. 96 C 6961.

We agree with the conclusion reached in these cases that a plaintiff cannot establish standing to challenge the result of a bidding competition without establishing that he would have been successful but for defendants' conduct. Without such an allegation, a subcontractor would be hard put to claim to have suffered an injury. It is all the more difficult to recognize an injury to a legally cognizable interest that is distinct and palpable if plaintiff does not alleged that he, at the very least, actively entered into the competitive fray.

Where a plaintiff cannot establish that it would have obtained the contract but for the defendants' conduct, its damages are entirely speculative. As noted earlier, it is not sufficient to show that another member of the class might have been successful in it bid since standing of each class representative is analyzed in its own right. Warth v. Seldin, 422 U.S. 490, 502, 45 L. Ed. 2d 343, 357, 95 S. Ct. 2197, 2207 (1975). Moreover, if each member of the class were awarded

20

damages in the amount of the value of the contract regardless of its individual chances of winning the subcontract, the result would involve duplicative recoveries for a single injury, since the subcontract would only be awarded to one of the class members. It is noteworthy that the plaintiffs in this case cite to no authority as to how the loss of an abstract opportunity to compete could be calculated nor has our independent research found such authority.

Plaintiffs, however, argue that an injury to a legally cognizable interest for purposes of standing occurs when a subcontractor is merely deprived of the opportunity to bid for a subcontract, citing Phoenix Bond & Indemnity Co. v. Bridge, 477 F.3d 928 (7th Cir. 2007); Diaz v. Gates, 420 F.3d 897 (9th Cir. 2005); Mendoza v. Zirkle Fruit Co., 301 F.3d 1163 (9th Cir. 2002); Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000); John T. Callahan & Sons, Inc. v. City of Malden, 430 Mass. 124, 713 N.E.2d 955 (1999); Technicable Video Systems, Inc. v. Americable of Greater Miami, Ltd., 479 So. 2d 810, 812 (Fla. App. 1985); Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332, (D.D.C. September 21, 2006); and Organization of Minority Vendors, Inc. v. Illinois Central Gulf R.R., 579 F. Supp. 574 (N.D. Ill. 1983). However, except for the last of these cases, Organization of Minority Vendors, each of these cases is inapposite.

We turn first to Phoenix Bond & Indemnity Co. v. Bridge, 477 F.3d 928, 930 (7th Cir. 2007). In that case, the plaintiffs were regular bidders at Cook County tax lien auctions that sued other bidders that violated one of the bidding procedures. Phoenix Bond & Indemnity Co., 477 F.3d at 930. Under the particular bidding system at issue, bidding parties would receive a portion of tax liens for each bid submitted. Phoenix Bond & Indemnity Co., 477 F.3d at 930. In order to

21

ensure the fairness of the bidding, the county, which conducted the auction, allowed bidding parties to submit a bid in only their own name and prohibited bidding parties from submitting a second bid in that same auction through a related entity. Phoenix Bond & Indemnity Co., 477 F.3d at 930. The plaintiffs alleged that the defendants violated this rule by submitting bids through related entities and thus were awarded more portions of liens than those that submitted only bids in their own name as required by the rule. Phoenix Bond & Indemnity Co., 477 F.3d at 930. Plaintiffs sued for damages equivalent to the value of the liens that would have gone to plaintiffs had defendants not violated the rule. Phoenix Bond & Indemnity Co., 477 F.3d at 930. In Phoenix Bond the plaintiffs pointed to specific additional properties whose tax liens they would have acquired if defendants had properly conducted the bidding. Thus, plaintiffs in Phoenix Bond & Indemnity Co., unlike plaintiffs in this case, showed that they suffered a distinct and palpable economic injury directly caused by the defendants' conduct.

Plaintiffs also cite to two related cases from the Ninth Circuit of the United States Court of Appeals for the proposition that a plaintiff suffers an injury for purposes of standing when it is deprived of its "legal entitlement to business relations unhampered by schemes" prohibited by the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §1961 et seq. (2002)). Mendoza v. Zirkle Fruit Co., 301 F.3d 1163 (9th Cir. 2002); Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000). In the first of these cases, Mendoza, the court concluded that legally documented agricultural laborers had standing to sue fruit growers for allegedly hiring undocumented laborers, who would work for less money, which caused the depression in the wages they were paid. Mendoza, 301 F.3d at 1166. Similarly in Knevelbaard

No. 1-08-1116

Dairies, the court concluded that the plaintiffs, a group of milk producers, had standing to sue

defendants, a group of cheese makers, for depressing the price of milk through price fixing

because the defendant's actions actually decreased the price at which the plaintiffs' product was

sold. Knevelbaard Dairies, 232 F.3d at 987-90. Thus, unlike in the case at bar, in both cases the

plaintiffs alleged that they individually would have received an economic benefit, namely, higher

wages and higher prices for their products, respectively, but for the wrongful conduct of the

defendants.

Plaintiffs next cite to an unreported case from the United States District Court for the

District of Columbia. In Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332 (D.D.C.

September 21, 2006), the nation of Portugal, the sovereign of East Timor, awarded plaintiff

Oceanic Exploration Company a 1974 concession to explore for and produce oil and natural gas

in the Timor Gap, an area of seabed between East Timor and Australia. When East Timor

became a part of Indonesia in 1975, the concession was invalidated by a treaty between Australia

and Indonesia. Thereafter, a joint authority established by Australia and Indonesia to grant

concessions for the development of natural resources in the Timor Gap awarded concessions to

defendant ConocoPhillips, among others, after a competitive bidding process. Oceanic did not

take part in the bidding process because it believed it already held legitimate rights to explore for

oil and natural gas under its 1974 concession from Portugal. Oceanic further alleged that

ConocoPhillips received its concession from the Joint Authority by bribing Indonesian officials.

Defendant ConocoPhillips argued before the district court that Oceanic lacked standing

because it failed to assert a concrete, particularized injury in fact, noting that Oceanic did not bid

23

for a concession and therefore could not claim that it was injured by the loss of the opportunity to compete or bid for the right to explore for oil and gas in the Timor Gap. The court rejected the proposition that the plaintiff lacked standing because it did not place a bid for a concession, holding that Oceanic was not required to place a bid to gain standing to challenge the bidding process because it had asserted that such participation in the bidding process would have been futile given ConocoPhillips' bribery of Indonesian officials. We find misplaced plaintiffs' reliance on Oceanic Exploration Co. In that case, the plaintiff had previously won the exploration rights at issue from the nation of Portugal only to have the contract invalided by treaty and thus was clearly in a position to have won those rights but for the fraud of its competitor. In this case by contrast, named plaintiffs have not alleged that they were similarly positioned to win subcontracts but for the fraud of defendants.

Plaintiffs next cite to Diaz v. Gates, 420 F.3d 897 (9th Cir. 2005). In that case, the plaintiff sued the City of Los Angeles for false imprisonment by police claiming that his wrongful incarceration deprived him of, among other things, employment opportunities. Diaz, 420 F.3d at 898. In that case, however, the court did not address the plaintiff's general standing to sue, but instead analyzed the narrow issue of statutory standing under RICO, which turned on whether this loss of employment opportunities constituted an injury to "business or property." Gates, 420 F.3d at 900. The court held that the loss of an employment opportunity constituted a RICO injury because such an injury gave rise to an action for interference with prospective business relations under California tort law. Gates, 420 F.3d at 900. Because Gates did not concern general constitutional standing, it is not persuasive authority that plaintiffs had such

24

constitutional standing in this case.

Plaintiffs also rely on a decision of the District Court of Appeal of Florida in Technicable Video Systems, Inc. v. Americable of Greater Miami, Ltd., 479 So. 2d 810, 812 (Fla. App. 1985), where the court found that MBEs stated a cause of action for breach of contract against a general contractor that failed to hire MBEs as required by its contract with the city under a third-party beneficiary theory.  We find plaintiffs' reliance on that case misplaced given that the case did not address the issue of standing  and plaintiffs here have not attempted to claim status as third-party beneficiaries under the contract between the city and Waste Management.  Furthermore, the facts in that case show that the MBE subcontractor tried on numerous occasions to engage the defendants in negotiations to provide goods and services necessary to the execution of the contract.  Technicable Video Systems, Inc., 479 So. 2d at 811.  In this case, by contrast, plaintiffs do not allege that they made any attempt to engage Waste Management in negotiations for subcontracts as third-party beneficiaries or otherwise.

Likewise, the Massachusetts Supreme Judicial Court in John T. Callahan & Sons, Inc. v. City of Malden, 430 Mass. 124, 713 N.E.2d 955 (1999), upon which plaintiffs rely, is inapposite. In that case, the City of Malden solicited bids for the construction of two schools with the requirement that the successful bidder agree to abide by the project labor agreement (PLA) negotiated between the city and numerous unions.  John T. Callahan & Sons, 430 Mass. at 126, 713 N.E.2d at 958.  Nonunionized contractors filed a lawsuit objecting to that requirement, arguing that it violated Massachusetts' competitive bidding statute.  John T. Callahan & Sons, 430 Mass. at 125, 713 N.E.2d at 957.  The city also required that each bidding contractor to post

a security in the amount equal to 5 % of the value of its bid, which would be forfeited by the winning bidder in the event that it failed to execute the PLA. John T. Callahan & Sons, 430 Mass. at 127, 713 N.E.2d at 958. Defendant's argued that the plaintiffs did not have standing to bring the lawsuit because none of them had filed bids and thus could not have suffered legal harm. John T. Callahan & Sons, 430 Mass. at 129, 713 N.E.2d at 959. The court rejected that argument noting that each contractor that submitted a bid would have to post a 5 % bond which would have to be forfeited in the event it received the contract but refused to sign the PLA. John T. Callahan & Sons, 430 Mass. at 130, 713 N.E.2d at 960. The court held that it was not necessary in such circumstances for a potential bidder to incur such a harsh financial penalty in order to gain standing to challenge the legality of the bidding process. John T. Callahan & Sons, 430 Mass. at 130, 713 N.E.2d at 960. John T. Callahan & Sons may be read to support the proposition that, to have standing, a contractor need only allege that it was deprived of the opportunity to bid without also alleging that it would have won, a proposition with which we disagree and which was rejected in Amtech, Daley's Dump Truck, and AT/Comm. The case cannot be read to support the proposition, however, that a subcontractor does not need to enter into the bidding process except under the circumstances of that case which required the posting of a bond at a substantial cost. Plaintiffs have not alleged that such a potential financial penalty was present here.

The last case advanced by plaintiffs in support of their claims of standing is the decision of the Northern District of Illinois in Organization of Minority Vendors, Inc. v. Illinois Central Gulf R.R., 579 F. Supp. 574 (N.D. Ill. 1983). In that case, a group of MBE corporations sued

railroad companies for engaging in racial discrimination in the solicitation of bids and the awarding of contracts for supplies and services. Organization of Minority Vendors, Inc., 579 F. Supp. at 578. The Organization of Minority Vendors, Incorporated (OMVI), alleged that the defendants received funding from the federal government to complete infrastructure improvements under the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4-R Act) ( 45 U.S.C. §801 et seq. (1982)) and were obligated by law to refrain from discriminating against minorities in employment and procurement activities and to take affirmative action to insure that " 'minorities and MBEs receive a fair portion of employment and contractual opportunities' " created by the program. Organization of Minority Vendors, Inc., 579 F. Supp. at 579-80, quoting 49 C.F.R. §265.9. The OMVI alleged that the defendants discriminated against MBEs by failing to extend bid invitations to them, failing to make timely responses to inquiries about business opportunities, and arbitrarily rejecting their bids. Organization of Minority Vendors, Inc., 579 F. Supp. at 585.

The defendants argued that the plaintiffs, both the individual MBEs and OMVI, lacked standing to bring the claims. Organization of Minority Vendors, Inc., 579 F. Supp. at 587. The district court rejected this argument, holding that the individual plaintiffs adequately alleged that they suffered economic injuries in the form of lost business opportunities and exclusion from full participation in government procurement program as a result of the defendants actions and that the relief sought would "do much to redress any economic injury already suffered by the plaintiffs as well as serve to prevent future injury." Organization of Minority Vendors, Inc., 579 F. Supp. at 588. The court further held that the plaintiffs had met the causation element of

standing, simply noting "the complaint in this action is directed against the parties who allegedly discriminated against the plaintiffs." Organization of Minority Vendors, Inc., 579 F. Supp. at 588.

We note that the federal court decisions do not constitute binding precedent upon this court. Greer v. Illinois Housing Development Authority, 122 Ill. 2d 462, 491 (1988) (Illinois courts not required to "follow the Federal law on issues of justiciability and standing"). Nor do we find that case to be otherwise persuasive. In this respect, we observe that the Organization of Minority Vendors court's analysis on the standing issue is limited to terse conclusions that the subcontractors alleged injury, that the complaint was directed against the parties who allegedly caused those injuries, and that the remedies sought would "do much to redress any economic injury already suffered by the plaintiffs as well as serve to prevent future injury." Organization of Minority Vendors, Inc., 579 F. Supp. at 588. The court left untouched and unexplained how it would calculate damages or how it would avoid duplicative recoveries if standing were granted to all subcontractors that could have bid for a subcontract without regard to the fact that only a small percentage of those class members would have actually received a subcontract. Thus, Organization of Minority Vendors cannot displace the decision of our court in Amtech and the decision of the federal court in Daley's Dump Truck, which stand for the proposition that a subcontractor suffers a legally cognizable injury sufficient to support standing only when it shows that it bid for the contract and would have won the contract but for the alleged violation of the bidding procedures. Amtech Systems Corp., 264 Ill. App. 3d at 1105; Daley's Dump Truck Service, Inc., 759 F. Supp. at 1501. We further note that Organization of Minority Vendors

28

predates the Northern District of Illinois's decision in AT/Comm that no standing existed even when the  subcontractor challenging a the award of a government contract to a general contractor alleged that the general contractor with which it partnered was the lowest responsible bidder and thus that it would have received the subcontract but for the bidding procedure violation.  In light of these authorities and the Organization of Minority Vendors court's lack of rationale for its holding finding constitutional standing, we find the decision in Organization of Minority Vendors unpersuasive.

Turning to the case at bar, we again note that plaintiffs contend in their complaint that as a result of the defendants' fraudulent conduct which resulted in MBE-designated subcontracts being awarded to the non-minority-owned Duff companies, they, as a class, suffered injury from the loss of profits and the loss of opportunities to do business with the city.  Plaintiffs further allege that no competition took place for the subcontracts awarded to the Duff companies and that the subcontracts were awarded in a closed selection process.

We note that each of the cases cited by the parties concerning subcontractor standing involve contracts that were put out on bid but the bidding process was undermined by the defendants' conduct.  The impact of those cases is all the more applicable here, where no bidding was alleged to have occurred.  Under the reasoning of the Illinois Appellate Court in Amtech and the District Court for the Northern District of Illinois in AT/Comm, which applied Illinois law, as well as the Washington federal court's decision in Daley's Dump Truck, a subcontractor has no standing to challenge the award of a contract to a competitor after a bidding process has been completed unless it can show that it would have won the contract but for the defendant's fraud.

In the absence of such an allegation, a subcontractor does not suffer an injury to a legally cognizable interest that is distinct and palpable. Greer, 122 Ill. 2d at 492-93. Furthermore, in many of the cases cited by plaintiffs, the plaintiffs were able to establish that they would have received a financial benefit but for the defendant's conduct. Phoenix Bond, 477 F.3d at 930; Mendoza, 301 F.3d at 1166; Knevelbaard Dairies, 232 F.3d at 987-90; Oceanic Exploration Co., No. 04-332; but see Organization of Minority Vendors, Inc., 579 F. Supp. at 588; Diaz, 420 F.3d at 900.

Applying this rationale to the facts alleged in the instant case, we note that plaintiffs' injury is far more speculative. As noted above, the plaintiffs contend that they were deprived of lost profits and the opportunity to bid when Waste Management awarded the subcontracts at issue to the Duff companies in a closed selection process. Thus, in contrast to the subcontractors in the above-cited cases, which alleged that bidding took place for the contract at issue and that they were denied standing, plaintiffs here have not even alleged that there was competition for the subcontracts. In other words, not only have plaintiffs failed to show that they competed for the subcontracts at issue and would have won the contracts but for the fraud, as required by those cases, but they have not even alleged that such a competition existed. While it may be more difficult to establish standing where no competitive bidding took place, it is not impossible in a nonbid situation for a specific subcontractor to show that it would have been the best suited to receive the subcontract but for the defendants' misconduct. As previously discussed, if a subcontractor were allowed to have standing on the basis of the mere speculation that a member of the class it purports to represent would have received the subcontract, it would violate the

holding of Warth that standing is measured by the class representatives not by the class as a whole. Warth v. Seldin, 422 U.S. 490, 502, 45 L. Ed. 2d 343, 357, 95 S. Ct. 2197, 2207 (1975).

We recognize that in upholding the prerequisite of standing to apply to class representatives under Warth, we cannot keep the door open to every conceivable MBE to seek individual private enforcement of the requirements of the city's MBE program. However, such private enforcement is inconsistent with the enforcement responsibility retained and implemented by the city itself. The contract between Waste Management and the city contained a provision stating that the failure by Waste Management to meet the MBE/WBE requirements would constitute a material breach of the contract and allow the city to terminate the contract or seek "such remedy as the City of Chicago deems appropriate." Furthermore, the MBE/WBE ordinance permits the city's chief procurement officer to assess a financial penalty against a city contractor for failing to satisfy the MBE or WBE participation commitments of the contract subject to the review of an administrative law officer. Chicago Municipal Code §§2-92-445 (a) through (d) (2008). The ordinance further provides that all funds collected as penalties must be used by the City "exclusively for development of M.B.E./W.B.E. programs and encouragement of M.B.E./W.B.E. participation in the city." Chicago Municipal Code §2-92-445(e) (2008). Thus, if a contractor violates the MBE/WBE program, the city has the right to seek financial compensation for that violation and use that money to advance the goals of the program, for the benefit of MBEs and WBEs generally. Indeed, we observe that in the decision cited by plaintiffs of the Seventh Circuit Court of Appeals concerning the criminal sentencing of James Duff, the principal of defendants REM and Windy City, although not dispositive, reveals that the city of

31

Chicago sought and received compensation in the amount of $10,933,016.02 in restitution, in part, to compensate the city for the harm to the MBE program caused by Duff's companies involved in the Waste Management contracts at issue. United States v. Leahy, 464 F.3d 773, 794 (7th Cir. 2007).

Last, we observe that the nature of the injury alleged by plaintiffs is even more speculative when analyzed in the context of the provisions of the MBE statute at issue in this case. Under the Chicago Municipal Code, all primary contractors that are not owned and operated by a minority or woman who enter into a contract to provide services or materials to the City of Chicago with a value of $10,000 or more are obligated to commit to the expenditure of at least 25 % of the dollar value of the contract to certified MBEs and at least 5 % of the value of the contract to certified WBEs by engaging MBEs and WBEs as subcontractors or by purchasing services or materials from such entities. Chicago Municipal Code § 2-92-440 (a) (2008).

According to the complaint, under Waste Management's contract with the city, it was responsible for the design, construction and operation of multiple Material Recycling and Recovery Facilities. Waste Management's contract rationally required the subcontractors from various specialties in the design and construction fields as well as subcontractors to operate the city's recycling program. Plaintiff A&T Trucking claims only to be in the business of "trucking, hauling, and some labor related services" and plaintiff ICS Illinois claims only to be in the business of "the provision of unskilled labor for janitorial, cleanup and/or sorting," only two types of work that would be required for the completion of the project. Thus, even if the plaintiffs here were the only contractors that could have been hired to complete these tasks, it

32

would not logically follow that, but for its fraudulent scheme, Waste Management would have satisfied the MBE expenditure requirements for the contract as a whole by hiring MBEs to complete "trucking, hauling, and some labor related services" or "the provision of unskilled labor for janitorial, cleanup and/or sorting."

Moreover, the MBE statute did not require Waste Management to satisfy the MBE requirements by hiring subcontractors at all. Under section 2-92-440(a) of the Chicago Municipal Code, a general contractor may satisfy the requirement of committing to the expenditure of at least 25 % of the dollar value of the contract to MBEs by either hiring MBEs as subcontractors or by purchasing services or materials from such entities. Chicago Municipal Code § 2-92-440(a) (2008). Therefore, Waste Management could have satisfied its MBE requirements without hiring a single MBE subcontractor.

In sum, not only have the plaintiffs not alleged that they bid on the subcontracts at issue and would have won those subcontracts but for the fraud committed by Waste Management and the Duff companies, they have not even shown that a competition for contracts involving their respective expertises took place or that such competition was required to take place. Thus, plaintiffs' claims that they were injured by the fraud of defendants are far more speculative than the injuries found insufficient to establish a legally cognizable injury for standing purposes in Amtech, Daley's Dump Truck, and A/T Comm. Because plaintiffs have not alleged a legally cognizable injury, they lack standing to sue the defendants. Therefore, the circuit court did not err in denying plaintiffs leave to file a fifth amended complaint against defendants.

Affirmed.

No. 1-08-1116

McBRIDE, and R.E. GORDON, J.J, concur.