# Illinois Official Reports

## Appellate Court

---

*Illinois Road & Transportation Builders Ass'n v. County of Cook*,
2021 IL App (1st) 190396

---

| | |
|---|---|
| Appellate Court Caption | ILLINOIS ROAD AND TRANSPORTATION BUILDERS ASSOCIATION, FEDERATION OF WOMEN CONTRACTORS, ILLINOIS ASSOCIATION OF AGGREGATE PRODUCERS, ASSOCIATED GENERAL CONTRACTORS OF ILLINOIS, ILLINOIS ASPHALT PAVEMENT ASSOCIATION, ILLINOIS READY MIXED CONCRETE ASSOCIATION, GREAT LAKES CONSTRUCTION ASSOCIATION, AMERICAN COUNCIL OF ENGINEERING COMPANIES (ILLINOIS CHAPTER), CHICAGOLAND ASSOCIATED GENERAL CONTRACTORS, UNDERGROUND CONTRACTORS ASSOCIATION OF ILLINOIS, and ILLINOIS CONCRETE PIPE ASSOCIATION, Plaintiffs-Appellants, v. THE COUNTY OF COOK, a Body Politic and Corporate, Defendant-Appellee. |
| District & No. | First District, Third Division<br>No. 1-19-0396 |
| Filed | March 3, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-CH-2992; the Hon. Peter Flynn, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Gino L. DiVito, John M. Fitzgerald, and Amanda N. Catalano, of Tabet DiVito & Rothstein LLC, of Chicago, for appellants.

Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein, Martha Victoria Jimenez, and James Beligratis, Assistant State's Attorneys, of counsel), for appellee.

Panel

JUSTICE ELLIS delivered the judgment of the court, with opinion. Presiding Justice Howse and Justice Burke concurred in the judgment and opinion.

## OPINION

¶ 1 In November 2016, Illinois voters approved an amendment to the Illinois Constitution, adding to the revenue article a new section 11, titled "Transportation Funds" (Amendment) (Ill. Const. 1970, art. IX, § 11 (amended 2016)). Roughly sketched, the Amendment requires that funds collected from transportation-related taxes and fees be spent only for transportation purposes.

¶ 2 Plaintiffs, an amalgamation of trade groups and associations that represent a variety of sectors in the transportation planning and construction industry, sued the County of Cook (County), claiming the County violated the Amendment by diverting tax revenues protected by the Amendment to *non*-transportation uses. Plaintiffs identified six different taxes the County imposed related to transportation, all of whose revenues, they say, should have been sequestered and used only for transportation-related purposes. Instead, those moneys were placed into the County's Public Safety Fund for non-transportation purposes to fund the county courts, jails, the sheriff's office, and like items.

¶ 3 The trial court dismissed the complaint, finding that plaintiffs lacked standing to sue and that, in any event, the complaint failed to state a violation of the Amendment.

¶ 4 We disagree as to standing. Plaintiffs have standing to challenge the County's alleged violation of the Amendment. But we agree, albeit for different reasons, that the complaint fails to state a constitutional violation. We thus affirm the trial court's judgment.

¶ 5                          BACKGROUND

¶ 6 In the November 2016 general election, voters across Illinois were presented with an initiative to amend the Illinois Constitution to protect funds generated from transportation-related taxes from being spent for any purposes other than transportation-related ones. Passage of the Amendment required approval of either three-fifths of those voting on the question or a majority of those voting in the election. See Ill. Const. 1970, art. XIV, § 2(b). The Amendment easily cleared that hurdle, garnering the support of nearly 80% of those who voted on the question.

¶ 7    On March 6, 2018, plaintiffs—a group of business and trade associations—filed this suit for declaratory and injunctive relief against the County. The complaint alleged that, "to plug gaps in its budget," the County was diverting "revenue from transportation-related taxes and fees to the County's Public Safety Fund," where it was then spent on non-transportation-related purposes in violation of the Amendment. Plaintiffs identified the following sources of revenue that were unconstitutionally diverted from transportation uses:

    (1) the Cook County Home Rule County Use Tax Ordinance (see Cook County Code of Ordinances § 74-270 *et seq.* (adopted Feb. 16, 2011);

    (2) the Cook County Retail Sale of Gasoline and Diesel Fuel Tax Ordinance (see Cook County Code of Ordinances § 74-470 *et seq.* (adopted Feb. 16, 2011));

    (3) the Cook County New Motor Vehicle and Trailer Excise Tax Ordinance (see Cook County Code of Ordinances § 74-230 *et seq.* (adopted Feb. 16, 2011));

    (4) the Cook County Home Rule Use Tax Ordinance for Non-Retailer Transfers of Motor Vehicles (see Cook County Code of Ordinances § 74-595 *et seq.* (adopted Nov. 15, 2011));

    (5) the Cook County Wheel Tax on Vehicles Ordinance (see Cook County Code of Ordinances § 74-550 *et seq.* (adopted May 21, 2020)); and

    (6) the Cook County Parking Lot and Garage Operations Tax Ordinance (see Cook County Code of Ordinances § 74-510 *et seq.* (adopted July 17, 2013)).

¶ 8    For ease of references, we will refer to these taxes listed above, collectively, as the "Cook County Transportation Taxes."

¶ 9    The complaint alleged that, despite the fact that each of these taxes was a "transportation-related tax within the meaning of [the Amendment]," the County was "deposit[ing] all revenue" from the taxes listed above "in the County's Public Safety Fund."

¶ 10    The Public Safety Fund, according to the complaint, funds operations of the County's criminal justice system, including the sheriff's office, the state's attorney, the department of corrections, and the clerk of the circuit court. The complaint alleges that "[t]he Public Safety Fund is not a transportation-related purpose within the meaning of Article IX, Sections 11(b) or (c) of the Illinois Constitution."

¶ 11    The County moved to dismiss the complaint, both for failure to state a claim and on standing and justiciability grounds. The trial court agreed with the County on both points, finding that plaintiffs lacked standing and that the complaint did not state a constitutional violation. The court thus dismissed the complaint. This appeal followed.

¶ 12                                    ANALYSIS
¶ 13                                       I
¶ 14                                       A
¶ 15    Our first question is whether plaintiffs have standing to challenge the County's alleged constitutional violation. A dismissal based on lack of standing is entered pursuant to section 2-619(a)(9) of the Code of Civil Procedure. See 735 ILCS 5/2-619(a)(9) (West 2018); *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999).

¶ 16    A complaint need not allege facts establishing standing. *International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 45 (2005).

- 3 -

In Illinois, lack of standing is an affirmative defense, placing the burden on the defendant to "plead and prove lack of standing." *Id.* Thus, when "standing is challenged by way of a motion to dismiss," the usual principles applicable to section 2-619 motions govern: "[A] court must accept as true all well-pleaded facts in the plaintiff's complaint and all inferences that can reasonably be drawn in the plaintiff's favor." *Id.* Appellate review is *de novo. Id.*

¶ 17     The standing doctrine assures that parties have a sufficient stake in the outcome of the controversy. *Scachitti v. UBS Financial Services*, 215 Ill. 2d 484, 493 (2005). But "it should not be an obstacle to the litigation of a valid claim." *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 330 (1997). The plaintiff's claimed injury must be "(1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 23 (2004).

¶ 18     Plaintiffs allege two forms of standing. The first is associational standing, as plaintiffs are all nonprofit trade associations representing various aspects of the construction industry.

¶ 19     Associational standing refers to the ability of an association to sue as a representative body on behalf of its members. The doctrine "is firmly established in federal law" and was first adopted in Illinois in *International Union*, 215 Ill. 2d at 48. Our supreme court expressly adopted the test for associational standing from the United States Supreme Court in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977). See *International Union*, 215 Ill. 2d at 51-52.

¶ 20     In *Hunt*, 432 U.S. at 343, the Supreme Court articulated a three-part test to determine if an association has standing to sue on behalf of its constituent members. An association will have standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

¶ 21     The County does not dispute that plaintiffs satisfy *Hunt*'s second and third requirements. We thus confine our analysis to a single question: whether the association plaintiffs have alleged " 'that [their] members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action.' " *International Union*, 215 Ill. 2d at 46 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

¶ 22     Which means that we return full circle to general standing principles. That is to say, have the members of plaintiffs' organizations suffered an injury that is "(1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief?" *Wexler*, 211 Ill. 2d at 23. And given the burden of proof on this affirmative defense, the real question is, has the County established that plaintiffs have *not* suffered such an injury?

¶ 23     We will briefly examine each of the plaintiff associations and their claim of injury suffered by their individual members.

¶ 24     Plaintiff Illinois Road and Transportation Builders Association (IRTBA) is a trade association consisting of "more than 350 member firms who design, build, and maintain Illinois' highways, transit systems, railways, and aviation systems." "Many" of its members "are based in Cook County and contract with the County to perform construction work on transportation-related project within the County."

¶ 25    Plaintiff Federation of Women Contractors (FWC) "consists of more than one hundred women and women owned firms working in the construction industry, including general and specialty contractors, subcontractors, architecture and engineering firms, and suppliers representing every facet and component of construction," the "majority" of which "are based in Cook County."

¶ 26    Plaintiff Illinois Association of Aggregate Producers (IAAP) is a not-for-profit trade association that represents "every sector of Illinois' non-coal aggregate mining industry." IAAP members are responsible for producing "more than 90 percent of Illinois' aggregate and industrial minerals at more than two hundred plants and facilities in seventy counties throughout Illinois, including Cook County." "Most of the aggregate material produced by IAAP members is utilized in road construction, including crushed aggregate in concrete and asphalt pavements and drainage bases under roads, sewers, parking lots, and sidewalks."

¶ 27    Plaintiff Associated General Contractors of Illinois (AGCI) "is one of the largest heavy-highway construction trade associations in Illinois." AGCI "represents highway, heavy, and utility contractors" and "has more than one hundred active, associate, and affiliate members, including members that are based in Cook County and that conduct business with Cook County."

¶ 28    Plaintiff Illinois Asphalt Pavement Association (IAPA) is a trade association with "nearly two hundred members, including sixteen members that produce or supply hot mix asphalt within Cook County and approximately ninety members that supply material, equipment, or services directly to Cook County or to the IAPA's plant mix members working in Cook County."

¶ 29    Plaintiff Illinois Ready Mixed Concrete Association (IRMCA) is a trade association representing "nearly 150" companies, including "multiple firms that supply concrete in Cook County."

¶ 30    Plaintiff Great Lakes Construction Association (GLCA) "represents more than two hundred member firms in twenty-seven work categories in the construction industry," "including approximately one hundred members who are based in Cook County."

¶ 31    Plaintiff American Council of Engineering Companies, Illinois Chapter (ACEC), is a "Statewide association dedicated solely to the interests of Illinois consulting engineering firms."

¶ 32    Plaintiff Chicagoland Associated General Contractors (AGC) is an association of general contractors whose membership includes "more than eighty" firms based in Cook County.

¶ 33    Plaintiff Underground Contractors Association of Illinois (UCA) is a not-for-profit trade association that "represents more than two hundred contractors and associate member companies in the sewer, water, utility, and underground industries throughout Illinois, including in Cook County."

¶ 34    Plaintiff Illinois Concrete Pipe Association (ICPA) is a not-for-profit trade association composed of "concrete pipe producers and affiliated companies serving the Illinois sewer and culvert market, including members based in Cook County."

¶ 35    As to each one of these association plaintiffs, the complaint alleges that its members "are suffering economic harm due to the County's ongoing violations of [the Amendment]"—more specifically, the County's diversion of money that allegedly must be spent for transportation-related purposes but, instead, is being transferred into the County's Public Safety Fund.

¶ 36    The injury the plaintiff members allege is not some " 'generalized grievance common to all members of the public.' " *Alliance for the Great Lakes v. Department of Natural Resources*, 2020 IL App (1st) 182587, ¶ 32 (quoting *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494 (1988)). Their injury is "distinct and palpable." *Wexler*, 211 Ill. 2d at 23. They are alleging the loss of business opportunity by virtue of a diminution in the number of projects put out to bid in Cook County. Economic harm has long been considered a sufficient injury to confer standing. See *Greer*, 122 Ill. 2d at 493; *International Union*, 215 Ill. 2d at 51 (denial of unemployment benefits was sufficient injury to confer standing on individual union members).

¶ 37    The remaining, interrelated two prongs, whether the members' injuries are "fairly traceable" to the County's allegedly unconstitutional conduct and whether a ruling in their favor is "substantially likely" to redress their injuries (*Wexler*, 211 Ill. 2d at 23), are where the parties do battle. We say they are interrelated because the case law, as we will see, sometimes considers them in tandem, and for good reason. Sometimes, perhaps often, the same causal link that connects the defendant's misconduct to the plaintiff's injury works likewise in reverse, such that judicial *elimination* of that misconduct would *heal* that injury.

¶ 38    Much of the County's argument against standing, in fact, interweaves the traceability and judicial-redress prongs in a manner that we could summarize in one word—speculation. Plaintiffs can only speculate that, had the transportation money not been diverted, the County would have implemented public transportation projects; they can only speculate that, even if the County had announced such projects, any one of their members would have been awarded the work; they can only speculate that, if they win this lawsuit and force the County to spend all this recovered and future money on transportation projects, they will be awarded any of *that* work.

¶ 39    Plaintiffs' response is that the County is weaponizing its unconstitutional behavior to insulate itself from judicial review: divert transportation funds, thereby fail to fund new transportation projects, and then claim that the firms that would have been eligible to bid on this work lack standing because they cannot point to any projects they lost out on. Under that circular theory, say plaintiffs, nobody could ever challenge the County's alleged unconstitutional diversion of funds. And if anyone would be motivated to force the County to comply with the constitution and sequester transportation tax revenue for transportation purposes, who more so than the firms that would financially profit from the resulting transportation projects?

¶ 40    We agree with plaintiffs' view of standing. To be sure, standing cannot be founded on a "highly attenuated chain of possibilities." *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013). But neither is certainty required. Particularly when the injury to a plaintiff is the loss of opportunity to obtain a benefit due to the government's failure to perform a required act—here, sequestering transportation funds—it is rarely possible to know with any confidence what *might* have happened, had the government performed that act, much less what precisely will happen in the future if the improper conduct is corrected. If such certainty were required, the doctrine of standing would substantially reduce, if not altogether eliminate, entire categories of lawsuits. And, as we explain below, that is not how we read the case law.

¶ 41    For example, in *West Virginia Ass'n of Community Health Centers, Inc. v. Heckler*, 734 F.2d 1570, 1572-73 (D.C. Cir. 1984), the plaintiffs—a hospital association and one of its members—sued the federal government, alleging that its formula for awarding block grants to

states under a federal statute "unlawfully deprived the State of West Virginia of monies to which it was entitled," to the tune of nearly $300,000. The governmental defendant claimed the plaintiffs lacked standing, as they "failed to demonstrate that a judicial decision mandating an increase in West Virginia's [block grant] funding would redound to their benefit." *Id.* at 1574. The court flatly rejected that argument, holding that "once appellants demonstrated that they would *qualify* to receive these funds, they need not shoulder the additional burden of demonstrating that they are *certain* to receive funding." (Emphases added.) *Id.* at 1576.

¶ 42    Likewise, in *National Ass'n of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321, 324 (D.C. Cir. 1976), the plaintiff, a national organization of community health centers, sued to force the Department of Health, Education and Welfare (HEW) to recover money that the department allegedly spent in violation of a federal statute. On appeal, HEW argued that the plaintiff lacked standing to challenge the allegedly illegal transfers because the plaintiff did not allege " 'that [the] illegal transfer of funds affected any of its members.' " *Id.* at 329. The court rejected that argument:

> "The less that is recovered in the four disputed states, the less will be available to the present applicants, including the [plaintiff] members; *these members are directly hurt by *** the sharp curtailment of their opportunities for funding. *** While it is not certain that [the plaintiff] members would be funded due to the extra recovery from their claim here, it is probable that the prospect of funding, itself substantial relief, would be enhanced.*" (Emphases added.) *Id.*

¶ 43    The probability that judicial relief would result in an economic benefit was likewise sufficient to support standing in *American Iron & Steel Institute v. Occupational Safety & Health Administration*, 182 F.3d 1261 (11th Cir. 1999). There, the American College of Occupational and Environmental Medicine (hereinafter, Doctors) challenged a regulation promulgated by the defendant, the Occupational Safety and Health Administration (OSHA), that enabled *non*-physician health-care providers to perform federally mandated medical evaluation services that, prior to the enactment of the regulation, could only be performed by physicians. *Id.* at 1266-67. The court held that the Doctors had standing, reasoning that the Doctors suffered an economic injury due to the "loss of patients and income[ ] inflicted by the lack of a requirement that medical evaluations be performed only by physicians" and reasoned that "this injury is redressable through judicial review" of the regulation. *Id.* at 1274 n.10.

¶ 44    Finally, plaintiffs cite *United States Women's Chamber of Commerce v. United States Small Business Administration*, No. 1:04-CV-01889, 2005 WL 3244182 (D.D.C. Nov. 30, 2005). At issue there was a federal law that established a preferential procurement program for women-owned small businesses (WOSBs). *Id.* at *1. But first, the Small Business Administration (SBA) was required to conduct a study to identify industries in which WOSBs were underrepresented and then, armed with that information, to propose procedures to implement the program. *Id.* at *2.

¶ 45    But for four years, the SBA had failed to conduct that study or propose implementation procedures, thus stalling the program's launch. The associational plaintiff, representing WOSBs, sued to compel the SBA to implement the study and issue proposed procedures. The government claimed the plaintiff lacked associational standing. First, said the government, the plaintiff members' injuries could not be fairly traced to the SBA's conduct because plaintiff could not identify a single member in its association that failed to obtain a government contract because of the lack of the WOSB procurement program. *Id.* at *8.

¶ 46    The district rejected that argument. To satisfy the traceability prong, the court wrote, the plaintiff need only show that " 'it reasonably could be inferred that' had the defendants conducted the study and adopted the procedures called for by the [federal law] 'there is a substantial probability' that one of its members would have benefitted." *Id.* (quoting *Warth*, 422 U.S. at 504).

¶ 47    The government also claimed the plaintiff members could not show that judicial redress would benefit them, that none of the plaintiff members could show they belonged to an industry eligible for the WOSB preference—because the SBA had not yet *identified* which industries were program-eligible. *Id.* The district rejected this "circular reasoning" and agreed with the plaintiff that the government's argument " 'imposes a "catch-22": illegally refusing to implement the mandates of the Act, while claiming that its refusal to implement the Act insulates its actions from review.' " *Id.*

¶ 48    We are persuaded by these federal decisions, cognizant that the very doctrine of associational standing comes from the (obviously federal) United States Supreme Court decision in *Hunt*, 432 U.S. 333. See *International Union*, 215 Ill. 2d at 51-52. Indeed, "to the extent that the State law of standing varies from Federal law, it tends to vary in the direction of greater liberality; State courts are generally more willing than Federal courts to recognize standing on the part of any plaintiff who shows that he is in fact aggrieved by an administrative decision." *Greer*, 122 Ill. 2d at 491; see *Alliance for the Great Lakes*, 2020 IL App (1st) 182587, ¶ 32 ("our supreme court has recognized that Illinois standing law is more liberal than federal law").

¶ 49    In any event, we agree with these decisions that, when association members can demonstrate an opportunity for financial benefits or contracts, the opportunity for which was denied due to the government's improper conduct, and the opportunity for which would be restored if they prevail in this lawsuit, those members have standing.

¶ 50    Here, then, the member plaintiffs' injuries are fairly traceable to the County's conduct in that they were denied the chance to bid on construction projects that inevitably would have come, and would continue to come in the future, if the County followed its (alleged) constitutional mandate and kept transportation dollars in a pot dedicated only for transportation. Likewise, this injury is capable of redress through judicial relief; if plaintiffs prevail in this lawsuit, the County will be required to claw back transportation tax dollars improperly diverted and will be prevented from diverting them going forward. That means a large pot of tax revenue that can only be spent for one purpose—transportation. It is more than substantially probable—it is a near certainty that the County (or for that matter, any government unit), given that money with only one purpose for it, would spend it for that purpose, all to the benefit of the members of the plaintiff associations.

¶ 51    Under these circumstances, it would defy logic and fundamental fairness to deny plaintiffs standing simply because they cannot demonstrate with certainty that they would have received in the past, or will receive in the future, a particular contract—particularly when the reason they cannot demonstrate it is the very (alleged) misconduct of the government at issue in the lawsuit. The *opportunity* to seek that benefit is more than enough to show that these plaintiffs are litigants with skin in the game, with " 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional

questions.' " (Internal quotation marks omitted.) *Kluk v. Lang*, 125 Ill. 2d 306, 318 (1988) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968)).

¶ 52    We are not moved by the County's citation to *I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211, 231 (2010), on which the circuit court relied to deny standing to plaintiffs here; that case was decided under markedly different circumstances. That lawsuit did not involve a suit for declaratory or injunctive relief against the government, seeking to correct alleged government misconduct that denies financial opportunities to scores of private companies. *I.C.S.* involved a class action brought by private firms against a private contractor, sounding in tort and seeking lost profits for the failure to pick one of the plaintiffs for a subcontracting job. Those facts, alone, puts *I.C.S.* miles away from this case.

¶ 53    The two named plaintiffs in that purported class action were firms certified by the City of Chicago as a minority business enterprise (MBE) or women-owned business enterprises (WBE) who were thus eligible for procurement preferences with the city. *Id.* at 215. The defendant contractor, Waste Management, procured a contract with the city and, instead of hiring a truly certified MBE or WBE firm for a subcontractor, hired three firms who fraudulently claimed to be MBE/WBE contractors. *Id.* The plaintiffs did not and could not allege that the subcontracts were let for competitive public bidding; that they would have secured those contracts, had they been so bid; or that they were anything more than private contractors upset that a private firm gave the contract to someone else, while violating city ordinances governing MBE/WBE preferences.

¶ 54    We affirmed the dismissal of the complaint for lack of standing. We held as follows: "a subcontractor has no standing to challenge the award of a contract to a competitor after a bidding process has been completed unless it can show that it would have won the contract but for the defendant's fraud. In the absence of such an allegation, a subcontractor does not suffer an injury to a legally cognizable interest that is distinct and palpable." *Id.* at 231.

¶ 55    *I.C.S.* thus addresses an entirely different situation, concerning a private companies' suit against another private company for monetary damages over a single lost job. The court analyzed numerous "disappointed bidder" cases in reaching its conclusion (see *id.* at 221-31), but ours is not a case involving a disappointed bidder seeking a single contract or damages for lost profits. Ours is an action seeking to declare government conduct unconstitutional and to enjoin that conduct in the future. The concept of "lost opportunities to bid" is relevant to standing in a materially different way here than it is in a tort action over a single construction job.

¶ 56    We thus hold that plaintiffs have established associational standing. As such, we need not consider the alternative claim of taxpayer standing.

¶ 57                                                                B

¶ 58    The circuit court also reasoned that there were justiciability problems with this lawsuit, that deciding this case would embroil the judiciary in policy choices over spending decisions and require judges to decide things better left to legislators. We see no such problem.

¶ 59    We are not being asked to construe constitutional language so ambiguous and ill-suited to judicial determination as what it means for the State to provide for " 'an efficient system of high quality public educational institutions and services.' " (Emphasis omitted.) *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 10 (1996) (quoting Ill. Const. 1970, art. X, § 1).

That was particularly inappropriate given that, as our supreme court noted, a review of the constitutional convention debates revealed that "the framers of the 1970 Constitution did not intend to formulate any specific definition of 'high quality,' nor did they anticipate that the concept would be defined by the courts." *Id.* at 27. The language of the Amendment before us is complex, as we will see, but far from incapable of judicial determination.

¶ 60 In discussing its justiciability concerns, the circuit court also cited *Glisson*, which involved constitutional language providing that " '[e]ach person has the right to a healthful environment.' " *Glisson*, 188 Ill. 2d at 224 (quoting Ill. Const. 1970, art. XI, § 2). The words in the Amendment before us are not so vague, aspirational, and subject to policy-driven debate as the definition of a "healthful environment." And more to the point, the citation is inapt, in any event. It is true that the supreme court affirmed the dismissal of the complaint in *Glisson* but not because it was nonjusticiable; the court dismissed the complaint for lack of standing because the plaintiff was trying to enforce the right to a "healthful environment" not on his own behalf, but on behalf of two species of fish. *Id.* at 231.

¶ 61 As will be shown, interpreting the Amendment will be no simple chore. But courts interpret difficult language all the time. In the end, this lawsuit makes one simple claim—the Amendment requires the County to sequester all revenues generated from transportation-related taxes and to spend that money only for transportation purposes. We must determine whether the Amendment does or does not do that very thing. It requires no policy judgment, no fiscal decisions, no embroilment of the judiciary into the everyday affairs of the legislature or a unit of local government. We must merely decide what the law is and enter judgment accordingly.

¶ 62 As we hold that plaintiffs have standing to challenge the County's actions, and we see no barriers to justiciability, we turn now to the merits.

¶ 63 II

¶ 64 The trial court dismissed the complaint for failing to state a claim under section 2-615 of the Code of Civil Procedure. See 735 ILCS 5/2-615 (West 2018). We accept as true all well-pleaded facts and draw all reasonable inferences in favor of the plaintiff. *Doe v. Coe*, 2019 IL 123521, ¶ 20. Our review is *de novo*. *Id.*

¶ 65 Our analysis requires a review of the Amendment. We apply the same principles to the construction of a constitutional provision as we would a statute. *Kanerva v. Weems*, 2014 IL 115811, ¶ 36. Our goal is to determine "the common understanding of the citizens who adopted" the Amendment. *Id.* We do so, first and foremost, by examining the Amendment's language, "the most certain route to determining the framers' intent." *Hooker v. Illinois State Board of Elections*, 2016 IL 121077, ¶ 47. If the language is clear and unambiguous, our inquiry ends, and we give the Amendment its intended effect without resort to extrinsic information. *Id.* ¶ 35.

¶ 66 The Amendment consists of six subsections. The first two subsections command the bulk of the parties' arguments and our analysis, so we start there:

"(a) No moneys, including bond proceeds, derived from taxes, fees, excises, or license taxes relating to registration, title, or operation or use of vehicles, or related to the use of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or to fuels used for propelling vehicles, or derived from taxes, fees, excises,

- 10 -

or license taxes relating to any other transportation infrastructure or transportation operation, shall be expended for purposes other than as provided in subsections (b) and (c).

   (b) Transportation funds may be expended for the following: the costs of administering laws related to vehicles and transportation, including statutory refunds and adjustments provided in those laws; payment of highway obligations; costs for construction, reconstruction, maintenance, repair, and betterment of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or other forms of transportation; and other statutory highway purposes. Transportation funds may also be expended for the State or local share of highway funds to match federal aid highway funds, and expenses of grade separation of highways and railroad crossings, including protection of at-grade highways and railroad crossings, and, *with respect to local governments*, other transportation purposes as authorized by law." (Emphasis added.) Ill. Const. 1970, art. IX, § 11(a), (b).

¶ 67     Subsection (c) provides a further description of the first category of funds described in subsection (b), "the costs of administering laws related to vehicles and transportation." Ill. Const. 1970, art. IX, § 11(c).

¶ 68     Subsection (d) prohibits the diversion of transportation funds "to any purpose other than those described in subsections (b) and (c)." Ill. Const. 1970, art. IX, § 11(d). Subsection (e) envisions future modes of transportation currently unknown and provides that "[i]f the General Assembly appropriates funds for a mode of transportation not described in this Section, the General Assembly must provide for a dedicated source of funding." Ill. Const. 1970, art. IX, § 11(e). Subsection (f) exempts federal funds from the Amendment entirely. Ill. Const. 1970, art. IX, § 11(f).

¶ 69     The County argues that the Amendment "is only applicable to situations involving governments' use of transportation-related monies as specified by an applicable *statute* and is thus inapplicable to the County under the circumstances of the instant case." (Emphasis added.) That is to say, because the Amendment only sequesters revenues whose expenditures are governed by a statute, it does not sequester the revenues from the Cook County Transportation Taxes at issue here, whose expenditures are authorized by home-rule power, not a state law.

¶ 70     Plaintiffs' view is that the Amendment applies to the spending of any transportation-tax-related revenues whatsoever within the State of Illinois, no matter the authority under which that money is spent—statute or local ordinance.

¶ 71     Before we go any further, it would be prudent to outline the various ways that a unit of local government may receive and spend tax revenues.

¶ 72                                         A

¶ 73     Federal funds aside, a home-rule unit may receive revenues in one of three ways: (1) from State-imposed taxes; (2) from taxes that the General Assembly authorizes the unit of local government to impose itself; or (3) in the specific case of home-rule units, from taxes the home-rule unit generates under its independent constitutional authority to tax. See Ill. Const. 1970, art. VII, § 6(a) (home-rule units have power to tax).

¶ 74     As to the first category, when the State imposes a tax and distributes some of the revenues to units of local government, a statute will typically specify how local governments must spend

that money. For example, the State imposes a motor fuel tax and distributes some of that revenue to counties, municipalities, and road districts. See 35 ILCS 505/2, 5, 8 (West 2018). A statute then dictates the purposes for which the relevant unit of local government may spend that revenue. Counties, for example, must spend that motor fuel tax revenue for such purposes as construction and maintenance of county and State highways, subdivision roads, county garages, grade separations and approaches, and bicycle markings and paths; paying principal and interest on road bonds; and allotting funds for retiring certain construction-related debt, bonds for superhighways, local mass-transit districts, and the like. See generally 605 ILCS 5/5-701 to 5-701.16 (West 2018).

¶ 75    As to the second category, the General Assembly may grant a unit of local government the power to tax an item or transaction that the unit of local government would not otherwise have the power to tax. For non-home rule units, that means *every* tax, as non-home-rule units lack any constitutional authority to tax and only have that taxing power granted them by statute. See Ill. Const. 1970, art. VII, § 7 ("[c]ounties and municipalities which are not home rule units shall have only powers granted to them by law," with exceptions not relevant here). And even home-rule units have limits on their constitutional taxing authority; for example, they may not tax income or occupations unless the General Assembly provides them that power by statute. See Ill. Const. 1970, art. VII, § 6(e). (Or, of course, the home-rule unit may *have* the independent authority to tax, but the General Assembly *preempts* that power and imposes its statutory will. See Ill. Const. 1970, art. VII, § 6(g).)

¶ 76    When the General Assembly provides a unit of local government statutory authority to impose a tax, the legislature may, if it chooses, likewise dictate the purposes for which that tax revenue is spent. For example, non-home-rule municipalities may impose a retailers' occupation tax, but they must spend that tax revenue on "public infrastructure" or "property tax relief" (with one caveat allowing some of them to spend it for general "municipal operations" until the year 2030). See Pub. Act 101-47, § 5 (eff. Jan. 1, 2020) (amending 65 ILCS 5/8-11-1.3). And because the General Assembly always retains the constitutional authority to preempt home-rule powers, nothing would stop the General Assembly from enacting a statute that authorized a home-rule unit to impose a tax *and* mandating how that tax revenue could be spent.

¶ 77    But that is up to the General Assembly, which could also choose to authorize a home-rule tax but remain *silent* on how the home-rule unit spends that tax revenue. For example, the General Assembly allows home-rule municipalities to impose a retailers' occupation tax, but that statutory grant of authority contains no mandate on how the home-rule unit may spend that money. See 65 ILCS 5/8-11-1 (West 2018). When a home-rule unit is not mandated by statute to spend tax revenue a certain way, it may spend the revenue as it pleases, under its general home-rule power. See *Allen v. County of Cook*, 65 Ill. 2d 281, 288 (1976) ("the manner in which the defendant county appropriates funds *** is a matter 'pertaining to its government and affairs' " within county's home rule powers (quoting Ill. Const. 1970, art. VII, § 6(a))).

¶ 78    The third category of revenues, as mentioned, are revenues specific to a home-rule unit—revenue from taxes a home-rule unit imposes by virtue of its independent constitutional authority to tax. Ill. Const. 1970, art. VII, § 6(a). That is, the home-rule unit does not look to a statute for taxing authorization. Typically, in this situation, the home-rule unit does not look to a statute for *spending* authorization, either; it spends that tax revenue under its general home-rule power to do so. See *Allen*, 65 Ill. 2d at 288. (Theoretically, of course, a statute could

mandate a home-rule unit's *spending* of its home-rule-generated tax revenue without tinkering with its *taxing* authority. Plaintiffs claim that happened recently; more on that later.)

¶ 79    To summarize, and putting aside federal funds, as they are not relevant here, a home-rule unit like Cook County may receive revenue from one of three sources: (1) revenues from taxes imposed by the State, which are distributed to units of local government, the spending of which is typically dictated by statute; (2) revenues from taxes the home-rule unit, itself, imposes, but by virtue of statutory authorization, that may or may not contain a statutory mandate on how that tax revenue may be spent; and (3) revenues from taxes imposed by the home-rule unit by its own constitutional taxing authority, not a statute, which typically does not involve any statutory mandate on how that tax revenue may be *spent*, either.

¶ 80    With that in mind, we turn to the substance of the parties' arguments about the meaning of the Amendment.

¶ 81                                                    B

¶ 82    Plaintiffs' position, again, is that Amendment applies to revenue generated from any transportation-related tax imposed by any government within Illinois, be it the State or a unit of local government like Cook County, regardless of whether a statute or a local home-rule ordinance governs the spending of that tax revenue. In other words, plaintiffs argue that the Amendment covers all three of the revenue sources that we have mentioned immediately above, insofar as those revenues come from transportation-related taxes.

¶ 83    The County, on the other hand, argues that the Amendment applies only to the spending of transportation-related tax revenue that is controlled by a statute—which, they say, excludes the six Cook County Transportation Taxes at issue here.

¶ 84    A reading of subsection (a) of the Amendment, alone, would support plaintiffs' argument. Again, subsection (a) provides:

> "(a) No moneys, including bond proceeds, derived from taxes, fees, excises, or license taxes relating to registration, title, or operation or use of vehicles, or related to the use of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or to fuels used for propelling vehicles, or derived from taxes, fees, excises, or license taxes relating to any other transportation infrastructure or transportation operation, shall be expended for purposes other than as provided in subsections (b) and (c)." Ill. Const. 1970, art. IX, § 11(a).

¶ 85    That language is broad. It contains no limitation on the types of "taxes, fees, excises, or license taxes" (*id.*) to which the Amendment applies. It contains no language or term of art that we would associate exclusively with acts of the General Assembly. It makes no attempt to differentiate between taxes and fees generated by operation of a statute versus those generated by operation of a municipal ordinance.

¶ 86    But of course, we do not isolate passages in our interpretation; we read the Amendment as a whole. *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 527 (1990). And subsection (b) contains language suggesting that our task is not so simple. Again, that subsection, concerning the purposes for which transportation-related taxes may be spent, reads as follows:

> "(b) Transportation funds may be expended for the following: the costs of administering *laws* related to vehicles and transportation, including *statutory* refunds

- 13 -

and adjustments provided in those *laws*; payment of highway obligations; costs for construction, reconstruction, maintenance, repair, and betterment of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or other forms of transportation; *and other statutory highway purposes*. Transportation funds may also be expended for the State or local share of highway funds to match federal aid highway funds, and expenses of grade separation of highways and railroad crossings, including protection of at-grade highways and railroad crossings, and, *with respect to local governments*, other transportation purposes *as authorized by law*." (Emphases added.) Ill. Const. 1970, art. IX, § 11(b).

¶ 87     The County points to language in subsection (b), italicized above, that includes the word "law" or some derivation of the word "statute." As the County correctly notes, those terms refer to acts of the General Assembly.

¶ 88     When the General Assembly passes a bill, that bill becomes a "law." Ill. Const. 1970, art. IV, § 8(b). The phrases "by law" or "authorized by law" refer exclusively to enactments of the General Assembly. See *Illinois State Toll Highway Authority v. American National Bank & Trust Co. of Chicago*, 162 Ill. 2d 181, 200 (1994) ("as provided by law" means as prescribed or provided by the General Assembly, as "specifically authorized by statute"); *Quinn v. Donnewald*, 107 Ill. 2d 179, 186-87 (1985) (phrase "by law" in 1970 Constitution refers to General Assembly's " 'entire law-making process' " (quoting 3 Record of Proceedings, Sixth Illinois Constitutional Convention 2180 (statements of Delegate Whalen))). Indeed, within the very same revenue article in which the Amendment appears as article IX, section 1, provides that "[t]he General Assembly has the exclusive power to raise revenue *by law* except as limited or otherwise provided in this Constitution." (Emphasis added.) Ill. Const. 1970, art. IX, § 1.

¶ 89     Municipalities and counties, in contrast, do not pass laws—they adopt ordinances. As just one example found in the Constitution, though otherwise not relevant here, the section governing home-rule units within the local government article contains this provision: "If a home rule county ordinance conflicts with an ordinance of a municipality, the municipal ordinance shall prevail within its jurisdiction." Ill. Const. 1970, art. VII, § 6(c). And when differentiating between acts of the General Assembly and acts of units of local government, the Constitution makes the distinction clear: "County officers shall have those duties, powers and functions provided by law and those provided by county ordinance." Ill. Const. 1970, art. VII, § 4(d). That sentence would be hopelessly redundant if "by law" and "by county ordinance" were one and the same.

¶ 90     And nobody could seriously claim that the term "statute" refers to an act of a unit of local government; it means a law passed by the General Assembly. Certainly in today's parlance, meaning the phraseology used circa 2016 when the Amendment was adopted, anyone would understand "statute" as applying exclusively to state legislative enactments. The General Assembly refers to its codified public acts as "statutes" and the compilation of them as "[c]ompiled [s]tatutes." 25 ILCS 135/5.04 (West 2018).

¶ 91     The lone reference to a "statute" in the Constitution, before the Amendment in 2016, makes this clear. It appears in article V, the executive article, which lays out the procedure when the governor reorganizes executive agencies in such a way as to contravene a "statute." Ill. Const. 1970, art. V, § 11. That can only mean a law passed by the General Assembly, the body that creates and circumscribes the power of executive agencies by law. See *Granite City Division of National Steel Co. v. Illinois Pollution Control Board*, 155 Ill. 2d 149, 171 (1993) (executive

agencies are creatures of statute that confines that agency's authority). Our supreme court interpreted its jurisdiction under the 1870 Constitution to hear cases involving the construction of a "statute" and held that it had no jurisdiction to hear an appeal over the construction of a municipal ordinance, as "an ordinance is not a statute." *Wood v. City of Chicago*, 205 Ill. 70, 72 (1903). We see no indication of a different meaning under the 1970 Constitution.

¶ 92    Simply put, the terms "law" and "statute," within the 1970 Constitution, are synonymous. They both refer exclusively to enactments of the General Assembly.

¶ 93    With that in mind, we examine the first of the two sentences contained in subsection (b):

"Transportation funds may be expended for the following: the costs of administering *laws* related to vehicles and transportation, including *statutory* refunds and adjustments provided in those *laws*; payment of highway obligations; costs for construction, reconstruction, maintenance, repair, and betterment of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or other forms of transportation; *and other statutory highway purposes*." (Emphases added.) Ill. Const. 1970, art. IX, § 11(b).

¶ 94    A lot to unpack there. But the upshot is that the County says the various references to "laws" and the term "statutory" clearly indicate an intent to only sequester revenues spent pursuant to statute.

¶ 95    Among several examples is the final catch-all phrase "and other statutory highway purposes." *Id.* It is tempting to invoke the familiar rule of construction here that, when a list is given, and an inclusive wrap-up modifier with the term "other" is used, that modifier describes the components of the list that preceded it. See *People v. Davis*, 199 Ill. 2d 130, 138 (2002) ("when a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the 'other' is interpreted as meaning 'other such like' " (quoting *Farley v. Marion Power Shovel Co.*, 60 Ill. 2d 432, 436 (1975))).

¶ 96    If that were the intent of the framers, it would follow that this final clause was intended to modify everything on the list that preceded it—that is, everything on that list was a "statutory highway purpose." And that would obviously support the County's read of the Amendment.

¶ 97    But no canon of construction is absolute; we will not invoke that or any other canon if it yields an illogical result. *People v. Hanna*, 207 Ill. 2d 486, 498 (2003). And while everything on the list preceding that final clause could theoretically be considered a "statutory" purpose, not everything would fall under the definition of a "highway" purpose. Plaintiffs point to language in the clause preceding the final clause, which includes purposes such as constructing and maintaining "mass transit, intercity passenger rail, ports, [and] airports"—none of which, say plaintiffs, could possibly qualify as "highways."

¶ 98    In determining what a "statutory highway" purpose means, it seems logical enough to consider how the legislature has historically defined it—in a "statute" that governs "highways." The Illinois Highway Code "defines "highway" as "any public way for vehicular travel which has been laid out in pursuance of any law of this State, or of the Territory of Illinois," including "rights of way, bridges, drainage structures, signs, guard rails, protective structures and all other structures and appurtenances necessary or convenient for vehicular traffic." 605 ILCS 5/2-202 (West 2018). And "[a] highway in a rural area may be called a 'road,' while a highway in a municipal area may be called a 'street.' " *Id.*

¶ 99    That definition of "highway" is broad, but not so broad to encompass a port or airport. So plaintiffs are correct. That canon of construction does not apply—not everything on that list in the first sentence is a "statutory highway" purpose.

¶ 100    Indeed, plaintiffs could turn the tables and use that reference to "statutory highway purposes" in their favor. That is, subsection (b)'s first sentence contains a list of four purposes, two of which mention "laws" or "statutory"—indicating enactments of the General Assembly exclusively—but two of which do not. The drafters thus obviously knew how to include those terms when they wished, yet they chose *not* to do so when describing the second and third purposes: "payment of highway obligations" and "costs for construction, reconstruction, maintenance, repair, and betterment of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or other forms of transportation." Ill. Const. 1970, art. IX, § 11(b). The absence of those terms in those clauses, then, might suggest that the drafters specifically intended *not* to limit the purposes to "statutory" ones and, instead, intended to include purposes contained in local ordinances, too. See *People v. Olsson*, 2011 IL App (2d) 091351, ¶ 9 ("It is a generally accepted canon of construction that the express inclusion of a provision in one part of a statute and its omission in a parallel section is an intentional exclusion from the latter.").

¶ 101    But on the other hand, if plaintiffs are correct and the Amendment restricts revenue spending governed by home-rule ordinance as well as statute, why mention "laws" and "statutes" without mentioning "ordinances," too? Or for that matter, the framers could have mentioned none of them, thereby including *all* of them. After all, that's what they did in subsection (a). They made no mention of statutes or ordinances and, by their absence, suggested a scope broad enough to encompass both. Yet in subsection (b)'s first sentence, they specified enactments of the General Assembly without ever *once* mentioning ordinances or enactments of home-rule units.

¶ 102    And on the subject of those few items that plaintiffs identify in subsection (b) that do not qualify as "highway" purposes—construction and maintenance of "mass transit, intercity passenger rail, ports, [and] airports" (Ill. Const. 1970, art. IX, § 11(b))—we find every reason to believe that, while they may not be highway purposes, the drafters of the Amendment considered them *statutory* purposes. We reach that conclusion by looking at subsection (c) of the Amendment.

¶ 103    That subsection defines one of the purposes expressed in subsection (b), the first one: "the costs of administering laws related to vehicles and transportation, including statutory refunds and adjustments provided in those laws." *Id.* Subsection (c)'s description of that phrase includes the following:

> "*The costs of administering laws related to vehicles and transportation shall be limited to direct program expenses related to the following:* the enforcement of traffic, railroad, and motor carrier laws; *the safety of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, or airports*; and the construction, reconstruction, improvement, repair, maintenance, operation, and administration of highways, under any related provisions of law or any purpose related or incident to, including grade separation of highways and railroad crossings." (Emphases added.) Ill. Const. 1970, art. IX, § 11(c).

¶ 104    This language includes "the safety of *** mass transit, intercity passenger rail, ports, or airports" (*id.*) within the definition of "laws," meaning statutes.

¶ 105       That takes us to the other sentence in subsection (b), which provides further support for the County's claim that only the spending of revenues governed by statute are sequestered by the Amendment: "Transportation funds may also be expended for the State or local share of highway funds to match federal aid highway funds, and expenses of grade separation of highways and railroad crossings, including protection of at-grade highways and railroad crossings, and, *with respect to local governments, other transportation purposes as authorized by law*." (Emphasis added.) Ill. Const. 1970, art. IX, § 11(b).

¶ 106       "Authorized by law," as we have said, means authorized by statute. The reference there to "local governments" includes both home-rule and non-home-rule units, of course. The fact that this language treats home-rule and non-home-rule units the same, both requiring "authoriz[ation] by law," is telling because home-rule units do not always require authorization by law when they spend tax revenue. As noted at length above, sometimes, a statute authorizes a home-rule unit to impose a tax but does not mandate how that home-rule unit will spend the tax revenue, as we noted above with an example. See, *e.g.*, 65 ILCS 5/8-11-1 (West 2018) (allowing home-rule municipalities to impose retailers' occupation tax but not specifying how tax revenues must be spent). And of course, other times, a home-rule unit will impose a tax based on its own constitutional taxing power and will spend that tax revenue under its general home-rule powers, with no statute entering the picture at all. If plaintiffs are correct that revenues spent pursuant to traditional home-rule power are included within this scope, what "authorization by law" should that home-rule unit consult? If no statute governs its spending, what statute could the home-rule unit possibly consult for authority?

¶ 107       This language only makes sense one way: In allowing for "local governments" to spend transportation tax revenues for "other transportation purposes as authorized by law," the Amendment can only be referring to those situations where home-rule and non-home-rule units have the same spending powers—which is when, and only when, *they are following the spending dictates of a statute*. It is nearly impossible to reconcile plaintiffs' position, that all revenue spending is restricted by this Amendment, even that which is *not* governed by statute, with this language in the second sentence of subsection (b).

¶ 108       That subsection aside, the County's interpretation also finds support in the Amendment's subsection (e), providing that "[i]f the General Assembly appropriates funds for a mode of transportation not described in this Section, the General Assembly must provide for a dedicated source of funding." Ill. Const. 1970, art. IX, § 11(e). That provision is obviously intended for future, currently unknown modes of transportation and provides that if the state legislature decides that some new mode of transportation is worthy of state funding, it will have to dedicate a tax or other source of funding to it—which likely will have the effect, under subsection (a), of permanently locking in the protections of the Amendment over *those* revenues, too.

¶ 109       But why only mention the General Assembly and not home-rule units as well? If the Amendment is as broad as plaintiffs say, and the spending of revenue *not* governed by statute is also restricted, why give home-rule units a pass in subsection (e)? A home-rule unit is just as capable of "appropriat[ing] funds" for some new mode of transportation and equally able to "provide for a dedicated source of funding"—that is, impose a tax and dedicate a revenue stream—as the General Assembly is. Why lock down the General Assembly but give home-rule units a pass? If plaintiffs are correct, and the Amendment intended to restrict a home-rule unit's spending of transportation-related tax revenue not governed by statute but only via

- 17 -

home-rule ordinance, the drafters seriously whiffed by omitting home-rule units from the language of subsection (e). The exclusion of any reference to home-rule units in subsection (e) cannot be ignored.

¶ 110 We reach a final point raised by both parties: the absence of any mention of home-rule units and their powers anywhere in the Amendment. As we will see, it cuts both ways.

¶ 111 The County says if the drafters had intended to preempt home-rule power to spend revenue, the Amendment would have been required to specifically *state* that home-rule powers were preempted—much like statutes are required to specifically preempt home-rule power in various contexts. See Ill. Const. 1970, art. VII, § 6(i); 5 ILCS 70/7 (West 2018). Something along these lines: "The provisions of this Section are a denial and limitation of home-rule powers and functions." That is the language the General Assembly uses when it preempts home-rule authority. See, *e.g.*, Pub. Act 101-10, § 15-45 (eff. June 5, 2019) (amending 65 ILCS 5/8-11-1).

¶ 112 Or, says the County, if the framers intended the broad scope that plaintiffs advocate, they should have amended section 6 of the local government article, where home-rule powers are found. See Ill. Const. 1970, art. VII, § 6. The broad language there provides: "*Except as limited by this Section*, a home rule unit may exercise any power and perform any function pertaining to its government and affairs ***." (Emphasis added.) Ill. Const. 1970, art. VII, § 6(a). Right there, next to the italicized language, or at least somewhere within that "section," a reference could have been made to the Amendment being an additional restriction on home-rule power, along with others contained in that "section."

¶ 113 Plaintiffs respond that constitutional provisions may apply to and restrict home-rule power without using any such language—or without even mentioning home-rule powers. Nobody would dispute, for example, that provisions protecting free speech, the free exercise of religion, or the right to a non-diminished public pension are applicable to home-rule units, even though none of those provisions specifically say they are.

¶ 114 In fact, plaintiffs argue, the absence of any mention of home-rule powers cuts the other way. The drafters of the Amendment knew how to create exemptions—they did that very thing by exempting federal funds from its scope in subsection (f). See Ill. Const. 1970, art. IX, § 11(f). Thus, say plaintiffs, the absence of any mention of home-rule units suggests that no exemption for them was intended.

¶ 115 We would agree with plaintiffs to some extent. We are cited no precedent holding that the applicability of a constitutional provision to a home-rule unit is dependent on language within that provision specifically applying itself to a home-rule unit. And we can think of no reason why some bright-line rule of that nature would make sense.

¶ 116 The rule that *statutes* must expressly indicate a preemption of home-rule powers, while certainly contained in the Statute on Statutes (see 5 ILCS 70/7 (West 2018)), in reality stems not from that source but from the Constitution itself. See Ill. Const. 1970, art. VII, § 6(i) (home-rule units may exercise powers concurrently with State "to the extent that the General Assembly by law does not *specifically* limit the concurrent exercise or *specifically* declare the State's exercise to be exclusive" (emphases added)); *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 36.

¶ 117    But the Constitution contains no provision requiring that another *constitutional* provision, even an amendment, contain express language preempting home-rule power to be effective. The express-preemption rule for statutes does not apply to constitutional provisions.

¶ 118    Still, while it is true that the drafters of the Amendment did not contain an express *exemption* for the exercise of home-rule spending power, as it did for the expenditure of federal funds in subsection (f), we do find it significant that the Amendment contains no express *inclusion* of home-rule spending powers within its scope. We say that not as some bright-line rule but based on the specific language of the Amendment, as we have already discussed. After all, in subsections (b) and (c), the framers went to the trouble of specifically mentioning "laws" and "statut[es]" but never ordinances, and then in subsection (e) mentioned future restrictions on "the General Assembly" but not on home-rule units. Ill. Const. 1970, art. IX, § 11(b), (c), (e).

¶ 119    And when the Amendment did mention "local governments" (Ill. Const. 1970, art. IX, § 11(b)), a grand total of one time, it lumped all units of local government together, home-rule and non-home-rule alike. Treating them without distinction, in the context of spending power, makes sense only in situations where a *statute* governs the local governments' spending of tax revenue, rendering local governments of all kinds, home-rule or not, the same in their subordination to state law.

¶ 120    If the framers intended the Amendment to be read as plaintiffs contend, one would think that the framers might have noticed their frequent inclusion of words like "laws" and "statutory," their wholesale exclusion of the words "ordinance" or "home rule," their restriction on the General Assembly but not home-rule units in subsection (e), and their failure to make any distinction in their discussion of "local governments" between home-rule and non-home-rule units—and make *some* attempt to clarify that home-rule spending powers were being restricted by the Amendment. But they did not.

¶ 121    Where does that leave things? We think the County has the better of the argument. Yes, subsection (a) speaks in the broadest terms about revenue sources, favoring plaintiffs' interpretation. But that language is cabined by the language of subsections (b), (c), and (e), which lead to the almost inescapable conclusion that the Amendment covers only those revenues spent in accordance with state law, which would *exclude* transportation-related revenues spent pursuant to home-rule power.

¶ 122    If the County is right, why the broad language in subsection (a)? We would hazard this reason: The framers wrote subsection (a) so broadly because, in theory, *any* spending of tax revenue *might* be governed by statute. As we explained at the outset, all spending of state-imposed tax revenue is governed by statute, whether spent by the State or distributed to local governments. All spending of tax revenue by non-home rule units is governed by statute. And *some* spending of tax revenue by home-rule units is governed by statute—but all such home-rule spending, in theory, could be. The General Assembly can always preempt a home-rule unit's spending powers.

¶ 123    Viewed in that light, it might have made sense to the framers to draft subsection (a) broadly to account for all the transportation-related taxes imposed at any level of government, understanding that the limitations in subsections (b), (c), and (e) would cabin that scope.

¶ 124    Having said all this, while we find plaintiff's interpretation less convincing, it is not altogether unreasonable. The breadth of subsection (a), alone, gives one pause. Plaintiffs' position on subsection (b) is not unreasonable, either. While we prefer the County's take, it

remains fair to say that only some of the spending purposes listed in subsection (b) are modified by the word "law" or "statutory," leaving open the possibility that the framers omitted those modifiers when describing other purposes because they intended a broader meaning than merely "statutory" purposes. And as plaintiffs argue, if the intent of the framers were to altogether exclude home-rule spending powers from the Amendment, a few words would have done the trick.

¶ 125     In the end, the Amendment is far—light years—from a model of draftsmanship. Language favoring either the County's or the plaintiff's interpretation would have been quite easy to insert. In the face of two competing interpretations, both of which we find reasonable to one degree or another, we deem the language ambiguous. See *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11.

¶ 126                                              C

¶ 127     In the face of an ambiguous constitutional provision, we consider the legislative debates and the information provided to the voters of Illinois regarding the Amendment. See *Hooker*, 2016 IL 121077, ¶ 35 (when constitutional language is ambiguous, resort to extrinsic aids, such as "the drafting history of the provision," are appropriate (internal quotation marks omitted)). We will also consider recent legislation passed by the General Assembly that both parties have cited. We begin with the legislative debates.

¶ 128                                              1

¶ 129     First, some brief background. Generally speaking, the General Assembly has always had the authority to move revenue receipts—money—from one state fund to another. That is true even if a statute says that funds may not be transferred—because the General Assembly can always *amend* that statute and remove the transfer prohibition for that one time (if not permanently). See *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 25; *Department of Public Welfare v. Haas*, 15 Ill. 2d 204, 215 (1958) ("The fact that the legislature may provide that amounts, when collected, shall be placed in a certain fund does not ordinarily preclude a later General Assembly from ordering it paid into another fund or from abolishing the fund altogether."). Statutes exist at the whim of the General Assembly to amend as it pleases.

¶ 130     The movement of money from one fund to another is often called a "sweep" of that money. And a principal, if not *the* principal, problem that the supporters of the Amendment sought to address was "sweeps" of transportation-related funds into other, non-transportation-related funds. One example was the subject of a decision of our supreme court, *A.B.A.T.E.*, 2011 IL 110611, ¶ 19, which concerned the General Assembly's sweep of funds out of the Cycle Riders Safety Training Fund and into the General Revenue Fund.

¶ 131     A more common example is a sweep of the Road Fund, which over the years the General Assembly has frequently raided for other purposes. For example, in 2015, the year before the Amendment was placed on the ballot, the General Assembly swept $250 million from the Road Fund, along with $50 million from the State Construction Fund, $50 million from the Motor Fuel Tax Fund, $40 million from the County and Mass Transit District Fund, $10 million from the Grade Crossing Fund, and $9 million from the Public Infrastructure Construction Loan Revolving Fund—all into the General Revenue Fund, a decidedly *non*-transportation-specific fund. See Pub. Act 99-2, § 15 (eff. Mar. 26, 2015) (adding 30 ILCS 105/8.50).

¶ 132    In both the House and the Senate, supporters of the Amendment made prominent mention of the problem of sweeps from transportation-dedicated state funds into the General Revenue Fund or other non-transportation-specific funds. In his opening remarks on the House floor, the sponsor, Representative Phelps, complained that "Too many times we had funds that have been swept." 99th Ill. Gen. Assem., House Proceedings, April 22, 2016, at 18 (statements of Representative Phelps). He then had this exchange with Representative Sandack:

> "[REPRESENTATIVE] SANDACK: Representative, would this avoid any sweeps in the future if this question is approved by voters?
>
> [REPRESENTATIVE] PHELPS: That's exactly right.
>
> [REPRESENTATIVE] SANDACK: And it would keep segregated sacrosanct tax dollars for improvements to the infrastructure…for infrastructure and infrastructure only?
>
> [REPRESENTATIVE] PHELPS: Absolutely." *Id.* (statements of Representatives Sandack and Phelps).

¶ 133    In his introductory remarks in the Senate, the sponsor, Senator Haine, said this:

> "[M]otor fuel taxes and motor vehicle registration fees are today deposited into the Road Fund and the State Construction Fund to pay for construction projects and debt service on bonds issued for previous construction projects. Under this constitutional amendment, these revenue sources would be protected and can only be spent for transportation purposes. As a result, this amendment is intended to overrule the Illinois Supreme Court 2011 case A.B.A.T.E. of Illinois versus Quinn, which upheld the State's authority to repurpose and spend monies raised through motor vehicle tax—registration fees on non-transportation purposes." 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 58-59 (statements of Senator Haine).

¶ 134    We would quibble with one thing the senator said: The Amendment did not "overrule" the *A.B.A.T.E.* decision, which merely recognized the General Assembly's constitutional power to amend any statute and thus move money between funds at will. The Amendment simply imposed a constitutional limitation on the General Assembly's power to do so in the specific context of revenues generated by transportation-related taxes or fees. The General Assembly may still amend statutes and may still move money between funds, but if the revenues were initially generated by a State-imposed transportation-related tax or fee, that money must now be spent for some transportation-related purpose—no matter where the money moves, and no matter who spends it—the State or a unit of local government.

¶ 135    The legislative debates made this clear, if it were not already. For example, this exchange on the floor of the Senate between the Amendment's sponsor, Senator Haine, and Senator McConnaughay (for brevity, we omit from the transcript the statements of the presiding officer directing the conversation from one senator to another):

> "SENATOR MCCONNAUGHAY: *** I read in—the language in the constitutional amendment and I agree the language used is ambiguous. Do you view the language as ambiguous?
>
> ***
>
> SENATOR HAINE: Yes, somewhat, and that's why we're doing these questions to—to clarify this.
>
> ***

SENATOR MCCONNAUGHAY: Senator, you mentioned the—the motor fuels taxes in your introductory remarks and—and last answer. Am I correct that the constitutional amendment also protects the current distribution of monies raised from the State motor fuel tax *that are shared with local governments* as well as transferred to the State Boating Act Fund, Grade Crossing Protection Fund, and Vehicle Inspection Fund?

\*\*\*

SENATOR HAINE: Yes, that is correct. The current distribution of monies from the State motor fuel taxes are dedicated to transportation purposes. It is not the intention of this amendment to alter the current distribution of motor fuel tax revenues, including those distributions that are—that currently cover administrative costs." (Emphasis added.) *Id.* at 62-63 (statements of Senators McConnaughay and Haine).[1]

¶ 136    Presumably both parties would agree that this colloquy supports, if nothing else, the notion that the Amendment sequesters revenues from taxes imposed by the State itself, pursuant to state law (as always), and distributed to units of local government—home-rule or otherwise.

¶ 137    And the legislative debates further support the notion that the Amendment is intended to restrict a unit of local government's spending of its own tax revenues, as long as that spending, again, is controlled by statute:

"SENATOR MCCONNAUGHAY: Senator Haine, that leads me to my next question. What about the Regional Transportation Authority's sales tax that is imposed in Cook and the collar counties and the Real Estate Transfer Tax in the City of Chicago that are dedicated to Public Transportation Fund? Are those monies protected by this constitutional amendment?

\*\*\*

SENATOR HAINE: Yes, Senator McConnaughay. Those monies from the RTA sales tax and that portion of the City of Chicago's Real Estate Transfer Tax that the Chicago Transit Authority receives are protected by the constitutional amendment." *Id.* at 63 (statements of Senators McConnaughay and Haine).[2]

¶ 138    And the reason those Regional Transportation Authority (RTA) revenues are protected by the Amendment is that the spending of that tax revenue is dictated by *statute*. The RTA, a regional public transportation body, is a unit of local government created by the Regional Transportation Authority Act. See 70 ILCS 3615/1.01, 1.04 (West 2018). That act gives the RTA the authority to impose certain transportation-related taxes and provides that the revenue shall be spent "to carry out any of the powers or purposes of the [RTA]" (*id.* § 4.03(a)), which are then listed in various places throughout the act.

¶ 139    So far, so good. That confirms both parties' (and our) interpretation that the Amendment, if nothing else, "protects" or sequesters revenues from transportation-related taxes that are

---

[1]A nearly identical exchange took place on the floor of the House with the House sponsor, Representative Phelps. See 99th Gen. Assem., House Proceedings, April 22, 2016, at 20-21 (statements of Representatives Phelps and Fortner).

[2]Again, a nearly verbatim discussion of the RTA sales tax and Chicago's real estate transfer tax occurred on the House floor. See 99th Gen. Assem., House Proceedings, April 22, 2016, at 21 (statements of Representatives Phelps and Fortner).

spent pursuant to statute, either by the State itself or by a unit of local government following the dictates of a statute.

¶ 140 The big question here, of course, is whether the Amendment went further and likewise requires the sequestration of funds that a home-rule unit spends pursuant to its independent constitutional home-rule spending power, not pursuant to statute. On *that* question, the sponsors of the Amendment were emphatic—the Amendment was not intended to preempt home-rule spending powers. The Senate sponsor, Senator Haine, included this in his opening remarks:

"This proposed constitutional amendment is intended to be on a par with Article VII, Section 6 [the home-rule section] of the Constitution and current home-rule power. This proposed constitutional amendment is not intended to eliminate, restrict, or apply to current constitutional and statutory authority that home-rule units have relative to taxes, spending, and other public safety functions." 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 59 (statements of Senator Haine).

¶ 141 The County relies most heavily on a colloquy in the Senate between the sponsor and Senator Raoul (representing a district within the state's two largest home-rule units, the City of Chicago and Cook County):

"SENATOR RAOUL: As mentioned, this—this language is very ambiguous to me, so I just want to ask these questions. Senator Haine, Cook County imposes several taxes that provide revenue for public safety operations, including, but not limited to, the criminal court system, the Cook County Jail, Cook County Sheriff, the Cook County State's Attorney, the Office of the Chief Judge of Cook County. These taxes are imposed by virtue of Cook County's home-rule taxing authority under the Illinois Constitution. Specifically, Cook County imposes the Wheel Tax, New Motor Vehicle Tax, Motor Fuel Taxes, the Use Tax, the Non-Retailer Vehicle Transaction Tax, and the Non-Retailer Use Tax. Again, revenues from these taxes are used to pay for Cook County's public safety operations, including workers' compensation claims for affected public safety employees. Am I correct that under this constitutional amendment, Cook County could continue to spend the monies from—from these taxes on its public safety operations?

***

SENATOR HAINE: The answer is yes for four reasons. First, as I explained earlier, this proposed constitutional amendment is intended to be on a par with Article VI [*sic*] (VII), Section 6 of the Constitution and current home-rule power. The proposed constitutional amendment is not intended to eliminate, restrict, or apply to current constitutional and statutory authority that home-rule units have—have relative to taxes, spending, and public safety functions. Secondly, since the Cook County's Use Tax and Non-Retailer Use Tax are general taxes on all tangible personal property just like the State sales tax, those taxes are not covered by this constitutional amendment, as I've explained earlier. Thirdly, as I stated earlier, it is a valid transportation purpose to spend monies under this amendment on the enforcement of traffic, railroad, and motor carrier laws. As a result, Cook County can continue to spend monies from these public safety operations at—as it is today.

* * *

- 23 -

SENATOR HAINE: Finally, I draw your attention to page 2, lines 13-14 of the constitutional amendment. Here the amendment provides that transportation funds may be expended 'with respect to local governments, other transportation purposes as authorized by law.' The key phrase is 'authorized by law.'

* * *

SENATOR HAINE: This phrase, 'as authorized by law', includes local governments' current use as authorized by current law—for instance, critical public safety functions as police departments, jail operations, and courts. This provision is intended to be construed broadly so as not to interfere in any way with local governments' current authority and practices. The language permits the General Assembly to determine, with respect to local governments, what are other proper transportation purposes by statute. It is also permitting home-rule units to determine what are other proper transportation purposes as well by virtue of their home-rule taxing power under Article VII, Section 6 of the Constitution. Given that Cook County and the City of Chicago as well as other home-rule units have the home-rule power to impose taxes that you listed, this language provides a further basis allowing the home-rule units to spend these monies on public safety." *Id.* at 67-70 (statements of Senators Raoul and Haine).

¶ 142    There was a lot to that exchange, not all of it striking us as entirely accurate, but the important and unmistakable takeaway, at least for the County's purposes, is that it supports the notion that the drafters of the Amendment did *not* intend to sequester transportation-related tax revenues that Cook County spends pursuant to its home-rule authority. Senator Raoul mentioned nearly every single tax that is the subject of the complaint here, asking whether the Amendment prevented the County from spending those tax revenues as it deemed appropriate—that is, for public safety and not transportation—and the sponsor's answer was clear: the Amendment did *not* preempt Cook County's constitutional home-rule authority to spend those revenues as it sees fit. It is hard to get more on-the-nose than that.

¶ 143    The legislative debates thus support the interpretation the County advances and which struck us as the more reasonable of the competing interpretations. The Amendment restricts the spending of transportation-related tax revenues when the spending of that revenue is dictated by state law, but it does not impact a home-rule unit's spending of revenue pursuant to its constitutional home-rule spending power.

¶ 144    2

¶ 145    We also consult the explanations of the Amendment that were published and sent to the voters of this State, as required by the Constitution. See Ill. Const. 1970, art. XIV, § 2(b) ("Amendments proposed by the General Assembly shall be published with explanations, as provided by law, at least one month preceding the vote thereon by the electors."). This, in our view, should have prominent importance. After all, the General Assembly did not put this Amendment into the Constitution—it just put it on the ballot. The citizens of this State adopted this Amendment by their vote at the November 2016 general election. So it seems only fair and appropriate that we consider what the people of Illinois were told about this Amendment before they cast their vote.

¶ 146    The ballot summary from the Secretary of State printed the language of the Amendment in full and then provided an explanation of the Amendment as well as arguments for and against its adoption. The ballot summary's "explanation" read as follows:

"The proposed amendment adds a new Section to the Revenue Article of the Illinois Constitution that provides revenue generated from transportation related taxes and fees (referred to as 'transportation funds') shall be used exclusively for transportation related purposes. Transportation related taxes and fees include motor fuel taxes, vehicle registration fees, and other taxes and user fees dedicated to public highways, roads, streets, bridges, mass transit (buses and rail), ports, or airports.

Under the proposed amendment, *transportation funds may be used by the State or local governments only for the following purposes*: (1) costs related to administering transportation and vehicle laws, including public safety purposes and the payment of obligations such as bonds; (2) the State or local share necessary to secure federal funds or for local government transportation purposes as authorized by law; (3) the construction, reconstruction, improvement, repair, maintenance, and operation of highways, mass transit, and railroad crossings; (4) expenses related to workers' compensation claims for death or injury of transportation agency employees; and (5) to purchase land for building highways or buildings for to be used for highway purposes.

This new Section is a limitation on the power of the General Assembly or a unit of local government to use, divert, or transfer transportation funds for a purpose other than transportation. *It does not, and is not intended to*, impact or change the way in which the State and local governments use sales taxes, including the sales and excise tax on motor fuel, *or alter home rule powers granted under this Constitution*. It does not seek to change the way in which the State funds programs administered by the Illinois Secretary of State, Illinois Department of Transportation, and operations by the Illinois State Police directly dedicated to the safety of roads, or entities or programs funded by units of local government. Further, the Section does not impact the expenditure of federal funds, which may be spent for any purpose authorized by federal law." (Emphases added.)

¶ 147    By and large, its first two paragraphs merely parrot the language of the Amendment itself. Plaintiffs highlight the phrase, "*transportation funds may be used by the State or local governments only for the following purposes*." No distinction between which kinds of revenues, in other words. Plaintiffs are correct that the language is broadly worded. But the third paragraph goes into specifics, including, of course, the very specific language that the Amendment is not intended to "alter home rule powers granted under this Constitution." That language quite explicitly carves out an exception to the more general statement on which plaintiffs rely.

¶ 148    We can harmonize those two passages under the County's read of the ordinance. The notion that "transportation funds may be used by State or local governments only for the following [transportation-related] purposes" is not inaccurate. The Amendment *will* restrict local-government spending—except when a local government is spending under its "home rule powers," as the later phrase qualifies.

¶ 149    We cannot, on the other hand, harmonize this language under plaintiffs' read of the Amendment. There is no way to take plaintiffs' interpretation as doing anything *but* "alter[ing] home rule powers." Plaintiffs say we are wrong, that this language about not altering home-

- 25 -

rule powers is just a "passing comment" that "means only that the amendment was not intended to change the constitution's general formulation of home rule powers or to change the constitution's allocation of authority between the State government and home rule units of government."

¶ 150    That cannot be. Nobody reading the Amendment (or the ballot summary) would have thought it was so dramatic as to "change the constitution's general formulation of home rule powers," any more than it would have been read to change the general formulation of the General Assembly's powers. And in fact, under the County's interpretation, the Amendment does *not* "change the constitution's allocation of authority between the State government and home rule units of government." While plaintiffs are correct that the Amendment does not say "that home rule units would be exempt from the amendment or excused from complying with it," that is because home-rule units are not "exempt" *entirely* from this Amendment. If they are receiving funds from the State or dictated in any other way by the State as to how to spend transportation-related tax revenues, they are restricted by the Amendment. It is only when a home-rule unit is exercising its own home-rule spending authority that the Amendment does not apply.

¶ 151    The ballot summary's "arguments in favor of the proposed amendment" told the voters this:

> "Historically, the State and units of local government have used portions of revenue from transportation funds for other purposes. Approval of this amendment will ensure that transportation funds are used only for transportation purposes. This limitation provides a dedicated source of funding for projects that will increase the quality of Illinois' roads, bridges, bridge and road safety inspections, and mass transit. Improving the quality of our roads and highways will help reduce accidents and damage to vehicles caused by road conditions or hazards."

¶ 152    We find nothing in that language inconsistent with our interpretation, nor anything that remotely suggests that home-rule units' ability to exercise their home-rule spending power as they see fit is impacted by the Amendment. Nor do we find anything inconsistent in the published "arguments against the proposed amendment" sent to the voters:

> "Approval of the proposed amendment unnecessarily limits the power of the State and local governments to appropriate public revenues for the general welfare of all Illinoisans in order to protect funding for one particular purpose—transportation. Our elected officials should be asked to prioritize the use of public funds, but this amendment would restrict their ability to spend funds as the elected officials and taxpayers deem fit. As a result, elected officials may be asked to reduce funding for other priorities, such as education or social service programs."

¶ 153    This language is broadly worded but can easily fit within the County's interpretation. The State and, to a significant degree, local governments *are* "restrict[ed]" in how they spend certain forms of revenue under the Amendment. And the results of that restriction are just as described; officials will not be able to spend those funds on other priorities.

¶ 154    We do not find the ballot summary inconsistent with the County's interpretation. We would, on the other hand, find it hard to square the ballot summary with plaintiff's broader interpretation.

¶ 156 Though we find the legislative debates and the Secretary of State's published explanations consistent with the County's (and our preferred) interpretation of the Amendment, we comment on one other item called to our attention by both parties and capable of judicial notice, in any event—recent legislation passed by the General Assembly on this topic. In 2019, the General Assembly adopted Public Act 101-32 (eff. June 28, 2019) (adding 30 ILCS 178/5-10), which among other things created the "Transportation Funding Protection Act." The substantive law reads in its entirety as follows:

"(a) It is known that transportation funding is generated by several transportation fees outlined in Section 2 of the Motor Fuel Tax Act, Section 5-1035.1 of the Counties Code, Section 8-11-2.3 of the Illinois Municipal Code, and Sections 3-805, 3-806, 3-815, 3-818, 3-819, 3-821, and 6-118 of the Illinois Vehicle Code.

(b) The proceeds of the funds described in this Act and all other funds described in Section 11 of Article IX of the Illinois Constitution are dedicated to transportation purposes and shall not, by transfer, offset, or otherwise, be diverted by any local government, including, without limitation, any home rule unit of government, to any purpose other than transportation purposes. This Act is declarative of existing law." *Id.*

¶ 157 This act is consistent with the County's interpretation of the Amendment. For one thing, the taxes and fees listed in subsection (a) are obviously all statutorily authorized—the statutes are mentioned right there in the language—and thus carry with them statutorily dedicated purposes for which the revenues may be spent. And the reference to "other funds described in" the Amendment is a reference to revenues generated pursuant to laws like the one the legislators mentioned in debate, the Regional Transportation Authority Act, a statute that authorize non-home-rule unit taxes and prescribes how those revenue may be spent by that unit, the RTA. See 70 ILCS 3615/1.01, 1.04, 4.03, 4.03.1 (West 2018).

¶ 158 For another thing, this legislation does not preempt home-rule authority because it does not contain the requisite language specifically preempting home-rule powers. See 5 ILCS 70/7 (West 2018). And the reason it does not preempt home-rule power is that it is only referring to a home-rule unit's spending of tax proceeds *pursuant to statute*, where home-rule powers do not come into play. If this legislation were intended to restrict the home-rule power to spend, the preemption language would be required. See Ill. Const. 1970, art. VII, § 6(i); *Palm*, 2013 IL 110505, ¶ 36; 5 ILCS 70/7 (West 2018). Its absence speaks volumes.

¶ 159 Thus, subsection (b)'s reference to home-rule units of local government is simply a recognition, consistent with the County's read of the Amendment, that home-rule units spending transportation tax revenues under *statutory* authority (not their own independent constitutional authority) must spend the money on transportation purposes. That is why the language in the act indicates that its provisions are "declarative of existing law"—that is, declarative of what the Amendment already says. Pub. Act 101-32 (eff. June 28, 2019) (adding 30 ILCS 178/5-10(b)).

¶ 160 In sum, all of the extrinsic information that might inform us of the Amendment's intent points to the same conclusion that struck us as the most reasonable as well: The Amendment protects from diversion those revenues from transportation-related taxes whose expenditure is authorized by statute. The Amendment does not sequester revenues from transportation-related taxes spent by home-rule units pursuant to their independent constitutional spending power.

¶ 161                                    D

¶ 162    Plaintiffs complain that our interpretation renders the Amendment toothless. They say if the protections in the Amendment are based only on what is contained in a statute, and a statute may be amended at any time by the General Assembly, then the General Assembly could essentially legislate the Amendment out of existence through statutory changes to these laws. The County, for its part, and to our surprise, agrees—it likewise sees the logical extension of its position to be that the General Assembly can always amend statutes and remove transportation purposes from the statutory authorization for spending these moneys.

¶ 163    On this point, we disagree with the County. This Amendment is anything but toothless. Subsection (d) of the Amendment states that "[n]one of the revenues described in subsection (a) of this Section shall, by transfer, offset, or otherwise, be diverted to any purpose other than those described in subsections (b) and (c) of this Section." Ill. Const. 1970, art. IX, § 11(d). This language is easily broad enough to restrict the various statutory actions the General Assembly may take to circumvent the Amendment—sweeps by the General Assembly from one fund to another or legislative attempts to eliminate transportation purposes from statutory spending authorizations (or add non-transportation purposes to those statutes).

¶ 164    The point of the Amendment is to sequester transportation tax revenues from the moment they are generated until the moment they are spent—on transportation purposes. Subsection (d), as we read its broad language, would follow that money wherever it went and thwart any legislative attempt to divert those funds to other spending purposes. We fail to see how the General Assembly could "legislate around" the restrictions in the Amendment. We thus find no merit to the claim that our interpretation would render the Amendment functionally impotent.

¶ 165                                    E

¶ 166    The County argues that, because the Amendment is "only applicable to situations involving governments' use of transportation-related monies as specified by an applicable statute and is thus inapplicable to the County under the circumstances of the instant case," the lawsuit was properly dismissed. We agree, as we have said, with the County's interpretation of the Amendment. And we agree with its suggested disposition as well.

¶ 167    The taxes imposed by the County that are the subject of the complaint are six different taxes. The County spends the revenue from each of these taxes pursuant to its home-rule spending power, not in accordance with a statute. The Amendment thus does not restrict, or govern in any way, the spending of these tax revenues. We agree with the County that the complaint fails to state a claim for a constitutional violation and was properly dismissed.

¶ 168                               CONCLUSION

¶ 169    The judgment of the circuit court is affirmed.

¶ 170    Affirmed.